IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JUNE 1997 SESSION



FILED

May 27, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9610-CR-00369 |
| | ) | |
| | ) | Bradley County |
| v. | ) | |
| | ) | Honorable Mayo L. Mashburn, Judge |
| | ) | |
| DONALD RAY SHIRLEY, | ) | (Aggravated Robbery) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

William J. Brown
23 N. Ocoee Street
P.O. Box 1001
Cleveland, TN 37364-1001

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
        and
Timothy F. Behan
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Jerry N. Estes
District Attorney General
203 E. Madison Avenue
Athens, TN 37303-0647

OPINION FILED:_____

CONVICTIONS AFFIRMED; SENTENCES MODIFIED

Joseph M. Tipton
Judge

## O P I N I O N

The defendant, Donald Ray Shirley, appeals as of right from his three convictions by a jury in the Bradley County Criminal Court for aggravated robbery, a Class B felony. As a Range I, standard offender, he received concurrent sentences of twelve years for each offense and was fined twenty thousand dollars for each offense. He contends that:

> (1) there is insufficient evidence to support his convictions;
>
> (2) the trial court erred by failing to sever the charges for trial;
>
> (3) the trial court erred by admitting a crack pipe into evidence;
>
> (4) the trial court erred by failing to suppress evidence seized from the defendant's car;
>
> (5) the prosecuting attorney and the trial court made inappropriate remarks during the state's closing argument; and
>
> (6) the defendant's sentence is excessive.

We affirm the defendant's convictions and modify his sentences.

The defendant was charged with the November 29, 1995, aggravated robbery of a Rocky Top convenience store, the December 9, 1995, aggravated robbery of the Take Two Video store and the December 10, 1995, aggravated robberies of two Mr. Zip convenience stores in Cleveland, Tennessee. The four charges were tried together. The jury convicted the defendant of the aggravated robberies of the Mr. Zip and the Take Two Video stores and acquitted him of the Rocky Top robbery.

At trial, Sergeant Larry Pippinger of the Bradley County Sheriff's Department testified that he was traveling east on Paul Huff Parkway at 4:50 p.m. on December 10, when he saw the defendant wearing a green army jacket and driving a white Corsica in the westbound lane. Sergeant Pippinger said that he did a U-turn,

2

caught up with the car, and eventually stopped it. Sergeant Pippinger said that the defendant had a ski mask in the front seat of the car hidden under a jacket and that he found a Marksman BB pistol between the front seat and the console of the car. The army coat, BB pistol, and ski mask were introduced into evidence. At the time of his arrest, the defendant had two hundred and ten dollars in his coat pocket and a ten-dollar bill in the pocket of his pants.

Clint Denny, a detective with the Bradley County Sheriff's Department, testified that he inventoried the defendant's car the day after the defendant was arrested. He identified a crack pipe that he found next to the driver's seat. He said that the pipe was not readily visible in the car and that he had to move the seat belt out of the way to find it. He identified a picture of the crack pipe that he took after he had placed the pipe on the seat in the car. During cross-examination, Detective Denny admitted that he did not make an inventory list when he searched the car.

Annette Nicholson testified concerning the robbery of the Rocky Top convenience store. She described the robber as being a white male that was five feet and seven or eight inches tall and weighed around one hundred and thirty or forty pounds. She said that the robber was in his late twenties or early thirties and had sandy blond hair. Although she initially testified that the robber wore a dark blue ski mask, she said that the mask was similar to the one that had been introduced into evidence and stated that she could not remember whether the robber's mask was blue or black. Ms. Nicholson said that the robber wore a jacket that was big on him but that she could not remember whether the robber's jacket was consistent with the one that had been introduced into evidence. She stated that she also could not remember whether the robber wore anything on his hands. Ms. Nicholson testified that she recognized the gun that had been introduced into evidence because the robber held it within three to four feet of her.

3

Ms. Nicholson said that the robber entered the store and ordered her to open the drawer and to pull the tray out of the drawer. The robber then grabbed bills and ordered her to lie down. Ms. Nicholson identified the defendant as the person who robbed the store and estimated that he took three hundred dollars during the robbery. She was cross-examined about inconsistencies between the defendant's appearance and her initial description of the robber. She also admitted that the cash drawer contained two hundred dollars more than it was supposed to at the time of the robbery.

Kim Ochoa testified that she was working at the Take Two Video store when it was robbed at around 7:10 p.m. on December 9, 1995. She said that she and her son, Mike Ochoa, were in the store when the door to the store opened and closed briefly. She said that seconds later the robber rushed in waiving a black gun. She said that the robber inquired about the location of the safe and that she informed him that she did not have one. She said that the robber then asked where the cash drawer was and ordered her to remove it. Ms. Ochoa said that she told the robber that she could not remove it and the robber reached over the counter and started taking money from the drawer.

Ms. Ochoa testified that her son commented that the robbery was a joke and that the robber had a BB gun. She said that the robber replied that he would show the boy it was not a BB gun. She stated that the robber tried to cock the gun but had problems maneuvering it. She said that the robber wore gloves that were not slim fitting. As a result, the robber was clumsy and had trouble grabbing the money and handling the gun. Ms. Ochoa said that a car pulled up in front of the store's door while the robber was struggling with the gun, and the robber dropped some money and rushed out of the store. She said that the robber escaped with around one hundred and ten dollars in cash and a check.

4

Ms. Ochoa described the robber as being a white male who was five feet and six or seven inches tall and weighed between one hundred and fifty and one hundred and sixty pounds. She said that he had light blue eyes and estimated his age to be in the late twenties or early thirties. She said that he wore a dark-colored ski mask that had lint on it and was consistent with the mask that had been introduced into evidence. She said that the robber wore a green coat and used a gun. She said that the coat and gun were like those that had been introduced into evidence. She said that the robber's hair was sandy blond and stuck out of the bottom of the mask. She described the robber's hair as being a little longer than the defendant's and having a wave to it similar to the defendant's.

Ms. Ochoa testified that she was morally certain that the defendant was the person who robbed her, but she admitted that at the time of the preliminary hearing she did not know to a moral certainty that the defendant was the robber. She also said that she did not include the color of the robber's eyes or the fact that the robber had a mustache in the statement she gave police on the night of the robbery. She conceded that the green coat that was in evidence had tears in it and that she did not notice any tears in the robber's coat.

Mike Ochoa testified that he was also present when the Take Two Video store was robbed. He said that he heard the door open and saw the back of a green coat exiting the store and that less than a minute later, the robber entered the store wearing a green coat and a ski mask and holding a gun. He described the robber as being approximately five feet eight inches to five feet ten inches tall and estimated the robber's weight to be around one hundred and sixty pounds. He said that the robber is in his late twenties to early thirties and had sandy blond hair that was the same length as the defendant's. He said that the ski mask, gun, and green coat that had been introduced into evidence were like those used by the robber.

5

Mr. Ochoa testified that he told the robber that the gun was a BB gun and that the robber tried to cock the gun but was unable to do so because he could not get a good grip on the gun with the gloves he was wearing. Mike Ochoa said that he followed the robber out of the store and saw him drive off in a white, four-door Corsica. He said that he saw the robber while he was not wearing a mask. He said that he was pretty sure that the robber had a mustache and that he was positive that the defendant is the person who robbed the store.

During cross-examination, Mike Ochoa admitted that he did not mention the robber having a mustache or the color of the robber's eyes in the report he gave police on the night of the robbery. He also testified that the green coat fit the robber the same way it fit the defendant on the day of trial.

Kelly Roberts testified that she saw a man run out of the Take Two Video store with a gun in one hand and money in the other. She estimated that the man was five feet and seven or eight inches tall and weighed between one hundred and fifty and one hundred and seventy pounds. She explained that she could only see the man's silhouette. She said that the man got into a white Corsica.

Sarah Marlowe testified that she was robbed at around 4:00 p.m. on December 10, 1995, while she was working at the Mr. Zip convenience store on Westside Drive. She said that the robber entered the store wearing a dark-colored ski mask and an army jacket. She said that the robber pulled out a gun and ordered her to give him all the money in the drawer. She said that when she started handing the robber the money, he asked her to give him the drawer. He took all the cash out of the drawer and then left the store.

Ms. Marlowe described the robber as being between five feet six inches and five feet eleven inches tall and weighing between one hundred and fifty and one hundred and eighty pounds. She said that the robber's hair was the same color and length and had the same wave to it as the defendant's. She said that the coat, mask, and gun that the robber used were like those that had been introduced into evidence. Ms. Marlowe testified that she is sure that the defendant is the person that robbed her.

However, Ms. Marlowe admitted that she did not notice any lint balls on the robber's ski mask or any tears in the robber's coat. She testified that on the day of the robbery she described the robber as having short, straight, sandy-blond hair. She said that she told police that the robber was clean-shaven, wore a heavy coat, and used an automatic pistol. She admitted that she did not notice that the robber had a mustache and did not think that she was robbed with a BB gun until after the defendant was arrested. She also said that she was not sure about the color of the coat the robber wore and that the robber could have worn a black coat.

Brenda Underwood testified that she did an accounting of the Westside Road Mr. Zip store after the robbery. She said that seventy dollars was taken during the robbery.

Michelle Shutt testified that she was working at the Mr. Zip on Mouse Creek Road when it was robbed at 4:30 p.m. on December 10, 1995. She described the robber as being a white male who was five feet and six or seven inches tall and weighed around one hundred and fifty or one hundred and sixty pounds. She said that he had light-colored eyes and estimated his age to be in the late twenties or early thirties. She said the robber had blondish-brown, straight hair that was consistent with the defendant's on the day of trial. She said that the robber wore a black ski mask and

7

a green coat and used a black gun, consistent with those that had been introduced into evidence.

Ms. Shutt testified that the robber was the same height and weight as the defendant but that she does not know for sure whether the defendant is the person that robbed her. She admitted that she did not notice any lint on the robber's mask. She said that she initially told the police that the robber wore a gray sweatshirt but that she realized that the robber wore a green coat after she had flashbacks of the robbery during her sleep. Although she admitted that the green coat that was in evidence would not zip, she testified that the robber had the coat zipped up during the robbery and that the coat the robber wore was not buttoned.

Robin Shoat, the assistant manager of the Mr. Zip on Mouse Creek Road at the time of the robbery testified that she arrived at the store fifteen minutes after the robbery. She said that she determined that one hundred and sixty-five dollars was taken during the robbery.

Detective John Dailey of the Cleveland Police Department testified that it took him five minutes to travel the 2.7 miles between the two Mr. Zip stores in moderate traffic. He said that it took him around four minutes to drive from the Mr. Zip store on Mouse Creek Road to the area where the defendant was seen by Sergeant Pippinger. He said that the Mr. Zip on Westside Road is 1.3 miles from the defendant's residence and that the drive takes approximately three minutes traveling at a moderate speed. On cross-examination, Detective Dailey acknowledged that the defendant could have traveled from the Mouse Creek Road Mr. Zip store to his residence in three minutes and that instead, Sergeant Pippinger saw the defendant eighteen to twenty minutes after the robbery.

Andy Lockhart, a private detective, testified for the defense. He said that he saw around one hundred white Corsicas in Bradley County within eleven hours over a two-day period. He said that he photographed the cars but that not all of the photographs turned out well. Approximately seventy photographs of the white Corsicas were introduced into evidence. Mr. Lockhart testified about the time it would take to travel from each of the stores that were robbed to Interstate 75. He also identified various places a person could reach by driving twenty-seven minutes from the Mouse Creek Mr. Zip store. The defense also introduced the 1990 census from Bradley County showing a population of 16,937 white males between the ages of twenty and thirty and the employment of 1,854 white males in the construction industry.

## I. SUFFICIENCY OF THE EVIDENCE

Initially, the defendant contends that the evidence is insufficient to support his convictions because the state did not prove beyond a reasonable doubt that he was the person who robbed the stores. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

## A. Take Two Video

Kim and Mike Ochoa testified that they were certain that the defendant is the person who robbed the Take Two Video store. They testified that the defendant wore a black ski mask and green army coat during the robbery and used a black gun. Kelly Roberts and Mike Ochoa both testified that they saw the robber leave the store in a white Corsica. The defendant was stopped the day after the robbery while he was driving a white Corsica and wearing a green army coat. He had a ski mask and a BB gun in the car. According to Kim and Mike Ochoa, the mask, gun, and coat were just like the ones used by the robber. Ms. Ochoa testified that the robber escaped with a check and one hundred and ten dollars in cash. Based on this proof, the jury was justified in concluding that the defendant was guilty of the aggravated robbery of Kim Ochoa beyond a reasonable doubt.

## B. Westside Drive Mr. Zip

Sarah Marlowe testified that she is sure that the defendant is the person who robbed her while she was working at the Mr. Zip store on Westside Drive. She said that the robber entered the store wearing an army coat and a ski mask. She said that he pulled out a gun and ordered her to give him all of the money in the cash drawer. Less than an hour after the robbery, Sergeant Pippinger stopped the defendant while he was wearing an Army coat. Sergeant Pippinger found a ski mask and BB gun in the defendant's car. Ms. Marlowe testified that the coat, mask, and gun were like those that were used in the robbery. Brenda Underwood testified that seventy dollars was missing from the store after the robbery. Under these circumstances, the jury was justified in finding the defendant guilty of the aggravated robbery of Sarah Marlowe.

### C. Mouse Creek Road Mr. Zip

The proof at trial established that the Mr. Zip store on Mouse Creek Road was robbed thirty minutes after the Westside Drive store was robbed. Although Michelle Shutt testified that she is not sure that the defendant is the person who robbed her, she testified that the robber had the same general physical description as the defendant, including the same height, weight, hair color, and hair type. She also said that the robber wore a black ski mask and a green coat and used a black gun, consistent with those that the defendant had when Sergeant Pippinger saw him twenty minutes after the robbery. When viewed in the light most favorable to the state, see Cabbage, 571 S.W.2d at 835, this evidence supports the jury's conclusion that the defendant committed aggravated robbery of Michelle Shutt.

### II. SEVERANCE

Next, the defendant contends that the trial court erred by refusing to sever the charges against him. He argues that the robberies do not constitute a common scheme or plan and that proof of each of the robberies would not be admissible in the trial of the others. The state counters that each of the robberies is evidence of a common scheme or plan because the robberies are signature crimes. The state asserts that proof of each of the robberies is admissible in the trial of the others to show motive or identity.

Much of the same testimony that was presented at trial was also presented at a pretrial hearing on the defendant's severance and suppression motions. However, neither Kim Ochoa, Sarah Marlowe nor Michelle Shutt identified the defendant as the robber at the hearing.

Kim Ochoa testified that the robber was around five feet and five or six inches tall and weighed approximately one hundred and sixty pounds. She said that

11

the robber had light-colored eyes and wore a black ski mask, a green army jacket that came below his waist, and loose-fitting gloves. She estimated the robber's age to be in the late twenties or early thirties. She said that the robber had collar-length, sandy blond hair that came out of the bottom of his mask. She said that the robber's hair had a little wave to it and that the robber also had a moustache.

With respect to the manner in which she was robbed, Kim Ochoa testified that she heard the door open and close and that seconds later the robber rushed into the store waving a black gun and inquiring about the location of the safe. She said that she told him that she did not have a safe and that he ordered her to remove the cash drawer. Kim Ochoa testified that when she informed the robber that she could not remove the cash drawer, he reached over the counter and took money from it. She said that her son commented that the robber had a BB gun and that the robber tried to cock the gun. She said that the robber had problems handling the money and maneuvering the gun.

Mike Ochoa described the robber as being between five feet, eight inches and five feet, ten inches tall and weighing around one hundred and sixty pounds. He estimated the robber's age to be in the late twenties or maybe thirty. He said that the robber had sandy blond, collar-length hair that came out of the side of the mask he wore. He testified that the robber had a moustache. He stated that the robber wore a black ski mask and an army-green coat and used a black BB gun during the robbery. He said that he saw the robber drive off in a white, four-door Corsica. Mr. Ochoa testified that he picked the defendant's picture out of an array of photographs and also identified the defendant as the robber in a live lineup approximately one week later.

Kelly Roberts testified that she saw the silhouette of the robber as he was leaving the Take Two Video store. She stated that the robber had a gun in his right

12

hand and money in his left hand. She said that he wore a short, large coat and drove off in a white Beretta or Corsica.

Sarah Marlowe testified that the robber of the Westside Road Mr. Zip store was between five feet, eight inches and five feet, eleven inches tall and weighed between one hundred and fifty and one hundred and eighty pounds. She estimated his age to be in the twenties or thirties and said that he had medium-length, sandy hair that was "kind of wavy." She said that the robber wore blue jeans, a green army jacket, and a black ski mask with three holes in it. She said that the robber used what looked like a black, automatic hand gun and that the gun was consistent with the one that was taken from the defendant. She stated that she did not notice whether the robber had anything on his hands. She testified that the robber ordered her to give him all the money and threatened that there would be trouble if she did not hurry. She said that the robber also told her to give him the money drawer.

On cross-examination, Ms. Marlowe stated that she was not sure whether the robber had facial hair and admitted that she told a police officer that the robber was probably clean shaven. She testified that she did not notice anything distinctive about the robber's jacket. Although Ms. Marlowe said that she picked the defendant's picture out of an array of photographs on the night of the robbery, she said that she could not positively identify the defendant in a lineup. She said that when she was shown the lineup, she told officers that she thought that the robber was the defendant or another guy in the lineup.

Michelle Shutt testified that the robber of the Mouse Creek Road Mr. Zip store was between five feet, six inches and five feet, seven inches tall and weighed around one hundred and fifty pounds. She said that the robber was in his late twenties. She said that the robber had light-colored eyes and straight, shoulder-length, blondish-

13

brown hair. She said that the robber wore a black ski mask, a green jacket, and black leather gloves. She said that the robber used a black gun that looked like a police gun and was consistent with the gun that was taken from the defendant. Ms. Shutt testified that the robber entered the store and said, "Come on, let's go over to the register." She said that she and the robber walked to the register, where he ordered her to give him the money. She said that the robber never asked for the money tray but that she removed it and put it on the counter.

During cross-examination, Ms. Shutt admitted that she initially told police that the robber wore a gray sweatshirt and blue jeans. She acknowledged that on the night of the robbery she did not tell police that the robber wore a green jacket. She said that she cannot identify the defendant as the person who robbed her.

Andy Lockhart and the defendant's brother also testified at the hearing. Mr. Lockhart testified that he had seen approximately one hundred white Corsicas during an eleven-hour period. The defendant's brother testified that it is common for construction workers to wear green, army jackets like the one taken from the defendant. The trial court overruled the defendant's severance motion without stating its findings or rationale on the record.

We begin our discussion of the issue with our standard of review of a trial court's denial of a severance under Rule 14(b)(1), Tenn. R. Crim. P. Traditionally, the decision to sever offenses rested within the sound discretion of the trial court. See, e.g., Hardy v. State, 519 S.W.2d 400, 402 (Tenn. Crim. App. 1974). However, since the enactment of Rule 14(b)(1), Tenn. R. Crim. P., there has been some question as to whether the same standard applies. See, e.g. State v. McKnight, 900 S.W.2d 36, 50 (Tenn. Crim. App. 1994) (stating that severance is ordinarily a matter that rests with the trial court's discretion but that the general rule "is not necessarily applicable to the

14

severance of offenses"); State v. Edwards, 868 S.W.2d 682, 691 (Tenn. Crim. App. (1993); State v. Peacock, 638 S.W.2d 837, 839 (Tenn. Crim. App. 1982) (noting that the matter of severance under Rule 14(b)(1) is "not solely within the discretion of the trial court" and that cases to the contrary predate the rule). But see State v. Furlough, 797 S.W.2d 631, 642 (Tenn. Crim. App. 1990) (noting that the decision to grant a severance is "within the trial court's discretion").

Rule 14(b)(1), Tenn. R. Crim. P., mandates that a severance of permissively joined offenses be granted unless "the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Because the "primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of the indictment had been severed," see State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984), we believe that our standard of review of a trial court's denial of a severance under the rule is the same as our standard of review of a trial court's decision to admit or exclude evidence of other crimes under Rule 404(b), Tenn. R. Evid. When a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).

As previously discussed, a defendant is entitled to a severance under Rule 14(b)(1), Tenn. R. Crim. P., unless a two-prong test is met: (1) the offenses are part of a common scheme or plan, and (2) the evidence of one is admissible in the state's case-in-chief upon the trial of the others. State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993). A "common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." Id. at 289 (citing Peacock, 638 S.W.2d 837. This court has recognized three categories of "common scheme or plan" evidence: (1) evidence showing a distinctive design or signature crime,

15

(2) evidence demonstrating a large continuing plan or conspiracy, and (3) evidence that is part of the same transaction. State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995) (citing N. Cohen et al., Tennessee Law of Evidence, § 404.11 (2d ed. 1990)).

In this case, the state contends that the trial court properly refused to sever the charges against the defendant because they fit within the first category in that they are signature crimes and because evidence of each of the robberies would have been admissible at a trial on the others to establish the robber's identity or motive of the defendant. To fit within the signature crime category, the crimes at issue must be sufficiently similar and of a distinctive design so as to reflect a modus operandi that can be characterized as a signature by the perpetrator. "The test is not whether there was evidence that the defendant committed both crimes, but whether there was a unique method used in committing the crimes." Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978). Because the determination of whether offenses fit within the signature crime category and are admissible on the issue of identity is fact specific, a review of cases on the issue is helpful.

In Warren v. State, 156 S.W.2d 416 (Tenn. 1941), our supreme court upheld the introduction of evidence of the defendant's commission of a robbery a few nights after the robbery for which he was on trial. The defendant was charged with robbing people who were in a car that stopped in the road one night. Each of the witnesses to the robbery described the robber as being tall and wearing a jumper, overalls, and a black cap. The witnesses said that the robber had black grease or paint smeared on his face and that he approached the car with a pistol in one hand and a flashlight in the other. The state introduced the testimony of two witnesses who said that they were robbed in the same area at around the same time of night a few nights after the robbery with which the defendant was charged. The victims of the second robbery described the robber as wearing a black cap and overalls and as having his

16

face smeared with dark grease or paint. They also said that the robber approached them with a flashlight in one hand and a pistol in the other. The court held that the testimony concerning the second robbery was admissible because it found that the similarity in the circumstances between the two offenses was relevant to prove the robber's identity. Id. at 419.

The court later described the Warren case as marking the boundary for the admission of other crime evidence to establish identity. Harris v. State, 227 S.W.2d 8, 11 (Tenn. 1950). The court noted that the black paint or grease that was smeared over the robber's face was probably "such an unusual thing" that it, along with the other circumstances of the offenses, warranted the admission of the evidence of the second robbery. Id. at 11-12.

Harris is a rape case in which the state introduced proof that the defendant raped another woman a week before the prosecutrix was raped. Both rapes were committed by coercion, and both victims thought that a knife was used, although neither had seen one. The court reversed the defendant's conviction, noting that only one of the rapes "involved a perversion" and that the methods pursued in the two rapes were "not so peculiar as to render it unlikely that lustful men bent upon the crime of rape might not have pursued identical methods." Id. at 11.

Our supreme court dealt with the admission of other crime evidence to prove identity again in State v. Bunch, 605 S.W.2d 227, 230 (Tenn. 1980). The court explained:

> When evidence that the defendant committed another crime is offered to prove his identity as the perpetrator of the crime on trial, the modus operandi of the other crime and of the crime on trial must be substantially identical and must be so unique that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged.

17

(emphasis in original).

The defendant in Bunch and two codefendants were convicted of robbing a grocery store. Although witnesses to the robbery identified the codefendants, they were unable to identify Bunch. At trial, the state introduced proof that Bunch and the two codefendants robbed a cafe approximately four hours before the grocery store was robbed. The two robberies were similar in that, "(1) both robberies were perpetrated by . . . two men and one woman, (2) in both robberies the perpetrators closeted their victims in restrooms before leaving the premises, (3) the two business establishments robbed were located close to each other, and (4) the two robberies occurred fairly close in time to each other." Id. at 230. The court reasoned that the presence of the same codefendants at both robberies was a "unique factor" and held that proof of the prior robbery was admissible on the issue of Bunch's identity as the third robber. In reaching its decision, the court explained that "it is not necessary that the other crime be identical in every detail to the offense on trial; it is sufficient if evidence of the other crime supports the inference that the perpetrator of it, shown to be the defendant, is the same person who committed the offense on trial." Id. at 227.

This court upheld the denial of a severance in State v. Peacock, 638 S.W.2d 837 (Tenn. Crim. App. 1982). The defendant in Peacock was charged with five counts of armed robbery, three counts of aggravated rape, and two counts of aggravated sexual battery. The charges arose out of events that occurred on three different days over a two-week period at three different residences that were relatively close to each other. The proof showed that the defendant knocked on each of the residence's doors and demanded drugs, money, and jewelry. The defendant forced each of the victims to undress. He threatened to shoot each of the victims if they looked at his face or if they called the police after he left. The defendant sexually assaulted the victims at two of the residences. Given the similarities between the

18

offenses, this court determined that the offenses were part of a common scheme or plan and that the defendant was not entitled to a severance.

This court reached a similar result in White v. State, 533 S.W.2d 735 (Tenn. Crim. App. 1975). The defendant in White was charged with rape and robbery with the use of a deadly weapon. The state was allowed to introduce proof that the defendant had committed two prior rapes in a similar fashion. The rapes were similar in that all three of the victims testified that the rapist had a knife, moved them from the front seat to the backseat of his car, forced them to undress, discussed drugs with them, allowed them to use tissues, removed two of the victims' glasses, beat two of the victims, and rode around with the victims after the rapes before leaving them on the street and taking their purses. The victims also gave similar descriptions of the defendant's car, including the fact that there was no inside door handle on the passenger's door and that the hole where the handle belonged was covered with silver tape. This court concluded that "there is a modus operandi that is almost letter perfect in all three (3) of the rapes" and held that proof of the prior rapes was admissible to show the defendant's identity as the rapist. Id. at 743.

This court also affirmed the denial of a severance in State v. Edwards, 868 S.W.2d 682 (Tenn. Crim. App. 1993). The defendant in Edwards was convicted of twenty-one counts of rape, two counts of aggravated burglary and one count of second degree burglary, aggravated rape, assault with the intent to commit rape, and robbery. This court summarized the similarities between the offenses:

> the victims were white females between 21 and 24 years of age. The attacks took place in either apartment complexes or duplexes within a two-mile radius in the West Nashville area. Each of the victims was alone or appeared to be alone at the time of the attack. All were asleep. Each incident involved a burglary before the rape. All units were on the first floor. On every occasion, the assailant instructed the victims to remain quiet; rubbed the victims' breasts; and digitally penetrated the victims' vaginas. In those instances the attack was not interrupted, the assailant either attempted or completed

19

vaginal intercourse. Generally, the assailant either sought or took money. The crimes occurred within a 20-month period.

Although this court recognized that the individual similarities between the crimes were not particularly unique, it held that the number of similarities between the circumstances of the offenses established a distinctive design with sufficient uniqueness of method to constitute a common scheme or plan.

The defendant in State v. Hoyt, 928 S.W.2d 935 (Tenn. Crim. App. 1995), was charged with two counts of aggravated rape and one count of aggravated sexual battery each of which involved different child victims. The two aggravated rape victims, an eight-year-old girl and her nine-year-old brother, lived in the same household as the defendant and their grandmother. Both aggravated rape offenses involved oral penetration and occurred in the defendant's home during times when the victims' grandmother was absent. This court noted that the similarities between the aggravated rape offenses far outweighed the differences and held that the aggravated rape offenses were sufficiently similar to constitute a common scheme or plan. However, the trial court erred by denying the severance because the probative value of the other crime evidence was outweighed by the danger of unfair prejudice.

This court held that the trial court erred by admitting other crime evidence as being relevant to identity in Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978). The defendant in Young was convicted of armed robbery. The victim testified the defendant woke her at 5:30 a.m., held a knife to her throat, and demanded money from her. She said that the defendant wore an army fatigue jacket, a black "sweater-like cap," and a "thin veil" or loose stocking over his face. The state introduced evidence that the defendant had worn the same green jacket and knit hat when he burglarized another residence in the same neighborhood nine days earlier at 5:00 a.m. This court held that the trial court erred by admitting evidence of the other burglary

because there was little or no uniqueness in the method of the two crimes.  The court noted that the two residences were entered differently and that the burglar wore a thin veil or loose stocking over his face and used a knife in only one of the burglaries.  The court reasoned that there "was nothing unique or common about the method of commission of the two crimes to evidence that they were committed by the same person." Id. at 898.  Because the modus operandi of the two crimes was not the same, evidence that the defendant committed the earlier burglary was not admissible.

This court likewise held that other crime evidence was inadmissible to establish the defendant's identity in State v. Bobo, 724 S.W.2d 760, 765 (Tenn. Crim. App. 1981).  The defendant in Bobo was charged with robbing a Winn Dixie store in Johnson City, Tennessee, in October 1975.  The state submitted proof at trial showing that the defendant had committed a similar robbery of a North Carolina Winn Dixie store in October 1977.  In each robbery, the robber entered the store unmasked and wearing a coat and hat. Each robber went to the store's inside office with a pistol and confronted the manager, handing the manager a grocery bag and demanding money.  Neither robber took any coins or checks.  During the Tennessee robbery, the robber went to the store's safe after the manager had taken money from it and removed a magnetic tray that was attached inside the safe at the top.  During the North Carolina robbery, the robber ordered the manager to give him the money from the magnetic tray.

Although this court acknowledged the many similarities between the two robberies, it held that admission of evidence concerning the North Carolina robbery was reversible error.  The court reasoned "that there was nothing particularly unique about these robberies to show that the perpetrator of one committed the other.  Different persons could easily have employed the plan and method used in each robbery." Id. at 765.

21

As the foregoing authorities demonstrate, the determination of whether two or more offenses are signature crimes depends on whether the offenses were committed in a distinctive way. This distinctiveness is established by proof that the offenses were committed in an unusual manner or proof that the offenses are so strikingly similar that they must have been committed by the same person. As our supreme court explained,

> the proof depended on to show that the . . . crimes were committed by the same person must establish some peculiarity of plan or method common to the . . . offenses, otherwise evidence showing the defendant guilty of the collateral crime could do no more than indicate an evil propensity. Such propensity is not considered relevant to identify and the probable prejudicial effect of such evidence lies at the root of the rule excluding it.

Harris, 227 S.W.2d at 10. "The test is not whether there was evidence that the defendant committed both crimes, but whether there was a unique method used in committing the crimes." Young v. State, 566 S.W.2d at 898.

Although we view the issue as a close one, we cannot say that the trial court abused its discretion in denying a severance. Significantly, the robberies in this case occurred within a relatively short distance from one another over a twenty-four-hour period, with the two Mr. Zip robberies occurring within thirty minutes of each other. In each of the robberies, the robber wore a green army jacket and a black ski mask and used a gun. Each of the victims gave the same general physical description of the robber and described the gun that the robber used as being similar to the BB gun taken from the defendant. In each instance, the robber demanded money, and the robber ordered the two victims that did not automatically put the cash drawer on the counter to do so.

As in Warren, Bunch, Peacock, White, and Edwards, the similarities between the offenses in this case outweigh the differences. Although the individual similarities between the robberies are not particularly unique, when considered

22

together, the circumstances of the offenses established a distinctive design with sufficient uniqueness of method to constitute a common scheme or plan. Such a distinctive set of recurrent actions by the perpetrator of offenses that occurred so close in time and distance to one another would be admissible in separate trials for each of the offenses because of its relevance to the robber's identity, an issue litigated in the present case. Thus, we affirm the trial court's denial of a severance.

## III. INTRODUCTION OF CRACK PIPE

Next, the defendant contends that the trial court erred by admitting a crack pipe into evidence. The state contends that the trial court properly admitted the crack pipe as being relevant toward the defendant's motive for committing the aggravated robberies. We disagree.

At trial, the defendant requested a hearing outside the presence of the jury, and the trial court held a bench conference. At the bench conference, the defendant objected to the introduction of the crack pipe as being irrelevant and unduly prejudicial. The state responded that the pipe was relevant to show the defendant's motive. The trial court overruled the defendant's objection without stating its reasons for admitting the crack pipe.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Also, Rule 404(b), Tenn. R. Evid, prohibits the introduction of evidence of other crimes or bad acts, except when the evidence of other acts is relevant to a litigated issue, such as identity, intent, or rebuttal of accident or mistake, and its probative value is not outweighed by the danger of unfair prejudice.

The state contends that the trial court properly admitted the crack pipe as being probative of the defendant's motive and identity. We recognize that motive may be a proper basis for admitting evidence under Rule 404(b), because motive is often circumstantial proof of a material issue, such as identity, intent, or lack of accident. In this case, the state argues that the defendant's drug addiction motivated him to commit the aggravated robberies. However, the only evidence in the record relating the defendant to drugs is his possession of a crack pipe. Although this may indicate drug usage, it is only minimally probative of him having a cocaine addiction that motivated him to commit the robberies and even less probative of his identity as the robber. In our view, the trial court erred by admitting the crack pipe because any probative value the pipe has was outweighed by the danger of unfair prejudice. However, given the limited reference to the crack pipe in the context of the entire trial, we do not believe that the error affected the outcome of the trial. See T.R.A.P. 36(b).

## IV. SUPPRESSION ISSUE

Next, the defendant contends that the trial court erred by failing to suppress the evidence seized from his car after his arrest. The state counters that the evidence from the car was properly admitted because it was found during a search that was incident to a lawful arrest. See New York v. Belton, 453 U.S. 454, 460, 101 S. Ct. 2860, 2864 (1981).

At the suppression hearing, Sergeant Pippinger testified that he had heard about the Take Two Video store robbery at the time he stopped the defendant. He said that he had been told that the robber was a white male who drove a white, four-door Corsica, wore a ski mask and a green army jacket, and had sandy brown, wavy hair. Sergeant Pippinger said that the defendant matched the physical description of the robber, was wearing a green army jacket, and was driving a white four-door Corsica when he stopped the defendant. Sergeant Pippinger said that he told the defendant

24

that the defendant matched the description of a robbery suspect and frisked him for weapons. Sergeant Pippinger said that the defendant acted very nervous, fidgeted, and tried to move away from him.

Sergeant Pippinger testified that two other officers arrived on the scene and that they eventually handcuffed the defendant and placed him in the backseat of Sergeant Pippinger's car. Sergeant Pippinger said that he and another officer searched the defendant's car and found a ski mask and a BB gun under a multi-colored jacket on the front seat. He said that he did not see the mask and the BB gun before he searched the car.

Andy Lockhart testified that he saw around one hundred white Corsicas in Bradley County within eleven hours over a two-day period. Several of the photographs he took were introduced. The defendant's brother, a general contractor and real estate agent, testified that it was common for construction workers to wear green field jackets like the one taken from the defendant. The defense also introduced a copy of the 1990 census for Bradley County which shows that Bradley County had a population of 16,937 white males between the ages of twenty and forty years old. The census also indicates that 1,854 white males worked in the construction trade.

The trial court denied the defendant's motion to suppress. A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). In this case, the trial court denied the motion to suppress without stating any findings of fact or conclusions of law. We conclude that the record supports the denial of the motion to suppress.

25

The analysis of any warrantless search must begin with the proposition that such searches are per se unreasonable under the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few specifically established and well-delineated exceptions. Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967); State v. Tyler, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). Before the fruits of a warrantless search are admissible as evidence, the state must establish by a preponderance of the evidence that the search falls into one of the narrowly drawn exceptions to the warrant requirement. State v. Shaw, 603 S.W.2d 741, 742 (Tenn. Crim. App. 1980).

The state contends that the search in this case fits within the exception to the warrant requirement that permits an officer to search the passenger compartment of an automobile incident to a lawful arrest. See New York v. Belton, 453 U.S. at 460, 101 S. Ct. at 2864. The defendant argues that his arrest was not based upon probable cause and that the search of his car was unreasonable. We disagree.

Initially, we note that to make a constitutionally reasonable stop under the United States and Tennessee Constitutions, an officer must, at least, have a reasonable suspicion based upon specific articulable facts that a criminal offense has been or is about to be committed. See Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). An officer may make a warrantless arrest when the officer has probable cause to believe that the arrestee has committed a felony. T.C.A. § 40-7-103(a)(2).

Probable cause to arrest exists if the facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person in believing that the arrestee had committed an offense. Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 225

26

(1964); <u>State v. Melson</u>, 638 S.W.2d 342, 350-51 (Tenn. 1982). The existence of probable cause is a question of probabilities, not technicalities. <u>See</u> <u>State v. Jefferson</u>, 529 S.W.2d 674, 689 (Tenn. 1975).

Sergeant Pippinger testified that at the time he stopped the defendant he knew that the Mr. Zip store on Mouse Creek Road had been robbed. He said that he had been told about the Take Two Video store robbery that had occurred the day before and had been told to be on the lookout for the video store robbery suspect. He said that he was told that the video store robber drove a white, four-door Corsica, wore a green, army coat, and had sandy brown hair that was almost wavy in the back. Sergeant Pippinger said that he stopped the defendant after he saw that the defendant matched the physical description of the robber and was driving a white, four-door Corsica. Once stopped, the defendant fidgeted, acted nervous, and tried to move away from Sergeant Pippinger. Once Sergeant Pippinger determined that the defendant matched the description of the robber, he had the requisite reasonable suspicion to stop the car the defendant was driving. Given the defendant's appearance, coat, car, and nervous actions, Sergeant Pippinger also had probable cause to arrest the defendant for the video store robbery. Because the search of the passenger compartment of the defendant's car was conducted incident to a lawful arrest, the trial court properly denied the motion to suppress.

## V. IMPROPER ARGUMENT

Next the defendant contends that the prosecuting attorney made improper remarks during the state's closing argument and that the trial court made inappropriate remarks during a bench conference regarding the defendant's objection to the state's closing argument. The following is the portion of the state's argument that is at issue:

> But have you, have you figured out, ladies and gentlemen, the defense yet? You know, normally when -- you know, as is clearly stated, the defense does not have any, any requirement to do anything in the case, but have you figured out the

27

> defense, because I've heard several. Let me give you a couple that you've heard today.
>
> Number one that you heard -- well, that actually you didn't hear, but that counsel mentioned in opening statement was about alibi.

Defense counsel objected at this point, and a bench conference was held during which defense counsel argued that the state improperly commented on the defendant's right not to produce evidence.

The trial court agreed with the defendant that he did not have the burden of producing any evidence but also acknowledged that defense counsel told the jury during his opening statement that he was going to present alibi proof. When defense counsel asked the court how the state was allowed to comment on the lack of evidence introduced by the defendant, the court replied, "Well, looks to me like you just sort of suckered him in, into saying that." The defendant objected to the trial court's comments and stated that the comments were loud enough for the jury to hear. The court disagreed, stating that the comments were not loud enough for the jury to hear. At the conclusion of the bench conference, the court instructed the jury to "totally disregard" the prosecuting attorney's last remarks.

The prosecuting attorney's comments regarding the defendant's failure to call alibi witnesses were improper. See Tenn. R. Crim. P. 12.1(f) ("Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention."); see also State v. Meeks, 876 S.W.2d 121, 129 (Tenn. Crim. App. 1993) (noting that the seriousness of the error in admitting evidence of a withdrawn alibi defense was compounded when the state was allowed to refer to the withdrawn defense in their closing argument). However, the ultimate issue is not whether the prosecuting attorney's remarks were improper, but

whether the improper remarks could have affected the verdict.  <u>See</u> <u>Judge v. State</u>, 539

S.W.2d 340, 344-45 (Tenn. Crim. App. 1976).


In this vein, we note that the defendant has hampered our review of any

resulting prejudice by failing to include a transcript of the entire closing argument.  In

<u>Judge</u>, this court identified the following five factors to be considered in assessing the

prejudicial effect of improper argument or conduct:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

539 S.W.2d at 344.  In considering the record before us, including the evidence

presented and the immediate curative instruction given by the trial court, we conclude

that the defendant was not prejudiced by the prosecuting attorney's remarks.  The

defendant has likewise failed to establish that he was prejudiced by the trial court's

comments during the bench conference.


## VI.  SENTENCING

The defendant contends that the trial court improperly sentenced him to

the maximum sentence in the range for each robbery.  The state counters that the

record supports the twelve-year sentences the trial court imposed.


Appellate review of sentencing is <u>de</u> <u>novo</u> on the record with a

presumption that the trial court's determinations are correct.  T.C.A. §§ 40-35-401(d)

and -402(d).  As the Sentencing Commission Comments to these sections note, the

burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1995).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class B, C, D or E felony is presumptively the minimum in the range if neither enhancement nor mitigating factors are present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase

30

the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors.  T.C.A. § 40-35-210(d) and (e).  The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record.  T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

The presentence report reflects that the then thirty-three-year-old defendant dropped out of school in the tenth grade.  It states that the defendant reported that he dropped out of school to join the United States Navy but that he never enlisted.  It reflects that the defendant worked at two nursing homes over a period of one year and four months and that the nursing homes reported that he was a good employee with above average performance.  The report also reflects that the defendant was employed by his brother at the time of his arrest.

The presentence report shows that the defendant has several convictions from Florida, including selling marijuana, possessing marijuana, resisting arrest, and criminal mischief.  The report states that the defendant violated the conditions of his release while on probation.

Ms. Ginger Long, the officer that prepared the defendant's presentence report, testified at the sentencing hearing.  She explained that she contacted a probation officer in Florida and that he told her that the defendant had been on probation for a drug offense.  She said that the probation officer told her that the defendant had some technical violations but did not relate to her what the violations were.  Ms. Long said that the probation officer told her that the defendant was then placed on community control and he violated the conditions of that program by

31

absconding.  Ms. Long testified that she was told that the defendant was permitted to stay on probation and that the state of Florida agreed to release the defendant early.

During cross-examination, Ms. Long admitted that she did not know whether the probation officer who gave her information about the defendant had any personal knowledge of the defendant or any contact with him.  She said that she received a post-sentence investigation report from the state of Florida but that she did not speak to the person that prepared it.  She testified that she did not receive any information about the basis for the absconding violation.

Six witnesses testified at the sentencing hearing on behalf of the defendant.  They testified regarding the defendant's involvement in community activities such as the Boys and Girls Club of Cleveland, little league football teams, and a local church.  The defendant's brother testified that the defendant worked for him building homes, and he described the defendant's good record as an employee.  The defendant's wife testified that the defendant did not use alcohol or drugs and was not a violent person.  She described the defendant as a good husband and parent and as a generous person.

The defendant testified that he did not commit the crimes.  He conceded that he had prior convictions and that he had violated the conditions of probation by possessing marijuana and by failing to pay fines timely.  The defendant stated that he received a certificate in recognition of his duties performed while working at a nursing home.  He said that he has been taking classes to obtain his GED since his incarceration in this case.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to twelve years in the custody of the

32

Department of Correction for each aggravated robbery to be served concurrently. In sentencing the defendant, the trial court enhanced all of the defendant's sentences based upon his history of criminal behavior. See T.C.A. § 40-35-114(1). The court also stated:

> I also consider as an enhancement factor that at least one of these offenses involved more than one victim; . . . I believe it was Take Two Video, where . . . the victim of the case was the lady that . . . ran the place, but another victim of the offense was her son. . . . So with respect to him as an enhancement factor, I think the Court could determine that you had no hesitation about committing a crime when the risk to human life was high, or the crime was committed under circumstances in which the potential for injury was great. That's not applicable to the owner of the store, Mrs. Ochoa, because as far as I'm concerned, those two factors there are implicit in the crime of aggravated . . . robbery.
>
> So based upon the enhancement factors that I've mentioned and the absence of any mitigating factors, I sentence you to twelve years on each count of robbery, and I approve the jury's fine of $20,000 on each one.

### A. Mr. Zip Sentences

The defendant contends that the trial court erred by enhancing his sentences for the Mr. Zip aggravated robberies based upon factor (3), relating to the crimes involving more than one victim, factor (10), regarding the creation of a high risk to human life, and factor (16), involving the commission of a crime under circumstances evidencing a great potential for bodily injury to a victim. See T.C.A. § 40-35-114. The state agrees but contends that the twelve-year sentences imposed by the trial court are warranted based on the defendant's history of criminal behavior. See T.C.A. § 40-35-114(1). The defendant does not contest the application of factor (1), but he argues that his history of criminal behavior does not warrant the maximum sentence for the aggravated robberies.

We agree with the parties that factors (3), (10), and (16) do not apply to the defendant's sentences for the Mr. Zip aggravated robberies, but we note that the record is unclear as to whether the trial court applied these factors to the Mr. Zip

33

aggravated robberies. The trial court specifically justified its application of factors (3), (10), and (16) on Mike Ochoa's presence during the aggravated robbery at the Take Two Video store, but it did not then distinguish between the aggravated robberies when it imposed twelve-year sentences for each of them.

In any event, factor (3) does not apply to the defendant's sentence for the Mr. Zip aggravated robberies because each of those robberies only involved one victim. Factors (10) and (16) are inapplicable to the sentences for the Mr. Zip aggravated robberies because there is necessarily a high risk to human life and the great potential for bodily injury whenever an aggravated robbery is accomplished with a deadly weapon. See, e.g., State v. Claybrooks, 910 S.W.2d 868, 872-73 (Tenn. Crim. App. 1994).

However, the record supports enhancement of the defendant's sentences based upon his previous history of unwillingness to comply with the conditions of a sentence involving release in the community, a factor not applied by the trial court. See T.C.A. § 40-35-114(8). The presentence report reflects and the defendant admitted at the sentencing hearing that he violated his probation in the past.

With respect to mitigation, we note that several witnesses at the sentencing hearing testified concerning the defendant's involvement in the community and his family. See T.C.A. § 40-35-113(13). Although such testimony reflects favorably upon the defendant's amenability for rehabilitation, we believe that it is entitled to little weight in light of the defendant's prior criminal record and inability to comply with conditions of release.

Beginning with the presumptive minimum sentence and enhancing the defendant's sentence for the two applicable enhancement factors in light of the

mitigating proof that was presented, the record supports ten-year sentences for the Mr. Zip aggravated robberies. We therefore modify the defendant's sentences for the Mr. Zip aggravated robberies to ten years.

**B. Take Two Video Sentence**

The defendant also contends that the court erroneously enhanced his sentence for the Take Two Video aggravated robbery based on factor (3), relating to the crime involving more than one victim, factor (10), regarding the creation of a high risk to human life, and factor (16), involving the commission of a crime under circumstances evidencing a great potential for bodily injury to a victim. See T.C.A. § 40-35-114. The state concedes that the trial court erred by enhancing the defendant's sentence based on factor (10). However, it argues that the trial court properly applied factors (3) and (16) based on Mike Ochoa's presence during the robbery.

The defendant contends that the trial court erred by applying factor (3) to his sentence based on Mike Ochoa's presence during the aggravated robbery. We agree. Factor (3) applies when an offense involves more than one victim. T.C.A. § 40-35-114(3). In the context of T.C.A. § 40-35-114(3), the term victim is limited to a "person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994). The proof in this case did not establish that the defendant injured Mike Ochoa or took property from him. Thus, the trial court erred by enhancing the defendant's sentence based upon factor (3).

We agree with the defendant and the state that the trial court erred by applying factor (10) to the defendant's sentence for the Take Two Video aggravated robbery. A high risk to human life is inherent in every aggravated robbery accomplished with the use of a deadly weapon. See Claybrooks, 910 S.W.2d at 872-73; Manning v.

35

State, 883 S.W.2d 635, 640 (Tenn. Crim. App. 1994). Although we recognize that factor (10) may apply in situations where the defendant demonstrates a greater culpability than is inherent in the offense by endangering the life of someone other than the victim of the offense, see, e.g., State v. Bingham, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995), we do not believe that the defendant's use of a BB gun in this case warrants the application of factor (10).

Finally, the defendant contends that the record does not support the trial court's application of factor (16), regarding a great potential for bodily injury, to his sentence for the aggravated robbery of the Take Two Video store. We disagree. Like factor (10), factor (16) may apply when someone other than the victim was in the area at the time of the crime and subject to injury. State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995). By waiving the BB gun at Mike Ochoa, the defendant demonstrated a greater culpability and created a greater potential for bodily injury than was inherent in the aggravated robbery of Kim Ochoa. Thus, the trial court properly applied factor (16) to the defendant's sentence for the Take Two Video aggravated robbery.

As with the defendant's sentences for the Mr. Zip aggravated robberies, the record supports enhancement of the defendant's sentence for the Take Two Video aggravated robbery based on his past inability to comply with conditions of a sentence involving release into the community. See T.C.A. § 40-35-114(8). Applying the three applicable enhancement factors in light of the mitigating proof that was presented at the sentencing hearing, we conclude that the defendant's sentence for the aggravated robbery of the Take Two Video store shall be modified to eleven years.

In consideration of the foregoing and the record as a whole, the convictions are affirmed. The defendant's sentences for the Mr. Zip aggravated robberies in counts three and four of the indictment are modified to ten years apiece,

36

and his sentence for the aggravated robbery of the Take Two Video store in count two of the indictment is modified to eleven years, all to be served concurrently.  Also, the fines imposed by the trial court shall remain the same.

_____
_____Joseph M. Tipton, Judge

CONCUR:


(See separate concurring & dissenting opinion)
John H. Peay, Judge


_____
Curwood Witt, Judge