**STATE of Tennessee, Appellee,**

v.

**Bobby Ray TYLER, Appellant.**

Court of Criminal Appeals of Tennessee.

Feb. 19, 1980.

Permission to Appeal Denied by Supreme Court April 21, 1980.

William M. Leech, Jr., State Atty. Gen., Gordon W. Smith, Asst. State Atty. Gen., Nashville, J. William Pope, Jr., Dist. Atty. Gen., Pikeville, Mike P. Lynch, Asst. Dist. Atty. Gen., Winchester, for appellee.

Clinton H. Swafford, Jeffrey F. Stewart, Winchester, for appellant.

## OPINION

BYERS, Judge.

The defendant was convicted of murder in the second (2nd) degree and sentenced to serve thirty (30) years in the penitentiary.

He raises as issues on appeal the following:

(1.) Whether the trial court erred in failing to sustain the defendant's motion to suppress in respect to the search and seizure by a TBI Agent and the Franklin County Sheriff of physical evidence located on the premises of the private dwelling of the appellant,

(2.) Whether the trial court erred in admitting a statement given by the defendant,

(3.) Whether the trial court erred in refusing to grant a mistrial upon motion of the defendant based upon reference by the Attorney General to a written statement of Bobby Tyler, Jr., who is the son of the defendant and who was not called as a witness,

(4.) Whether the trial court erred in allowing a State's witness, Ronald Tucker, to testify in the presence of the jury about his conversation with Tammy Tyler, the daughter of the defendant, relative to who did the shooting and how the shooting had taken place,

(5.) Whether the trial court erred in refusing to grant the defendant's motion of new trial because the defendant had not been arraigned prior to the day of this trial.

The judgment is affirmed.

The evidence of the State, which is unrefuted, as the defendant neither testified nor offered any evidence of the shooting, was given by Tammy Tyler and shows the defendant, Ann Stella, the deceased, the defendant's daughter, Tammy, and the defendant's son, Bobby Ray Tyler, Jr., lived together in a house trailer on New Rock Creek Road in Franklin County.

On June 22, 1978, Tammy had worked all day in her maternal grandfather's store. At 5:30 she and the defendant left to drive home. On the way home, the defendant asked Tammy if she had ever seen anyone shot. When she replied she had not, the defendant said, "I [she] was going to see someone when I [she] got home."

She and the defendant arrived at the trailer near 6:00 p. m. The defendant, who had been drinking all day, lay down on a couch in the living room of the trailer. The defendant had a pistol in his hand. Ann Stella was working in another room and the defendant called her to come into the living room. The defendant asked Ann if she had had a good day. She replied, "Yes." The defendant said, "I am going to make it miserable." The defendant then called Bobby, Jr., into the room and said he was going to shoot Ann. The defendant fired two (2) shots into Ann's purse, which he had put on the floor. He told Ann that the bullet would do the same to her as it had to the purse—"go straight through her head."

The defendant told Ann, who was then sitting in a chair in the kitchen, to turn her head toward him. Bobby, Jr., was grabbing for the defendant's hand trying to persuade the defendant not to shoot. Tammy ducked her head and then heard a shot. When she looked up Ann was injured and the defendant and Bobby, Jr., had placed her on the couch. Tammy, on command of the defendant, ran across the street and asked Ronald Tucker to call an ambulance. When she returned to the trailer, the defendant was attempting to minister to Ann.

When the ambulance arrived, the defendant sent Tammy into the yard to tell the ambulance attendants they could leave because they were not needed. Shortly, Sheriff Brazelton, TBI Agent Parrot and two deputies arrived. Sheriff Brazelton knocked on the door. The defendant would not come out. Agent Parrot then called to him on a P.A. system to come out, and, after a delay of five to ten minutes, the defendant did so. In the interim, the defendant had moved Ann from the couch to the floor of a bedroom.

Sheriff Brazelton, after seeing through the open doorway what appeared to be blood on the couch and floor of the trailer, entered and discovered Ann dead or dying. The defendant was arrested and placed in a police car. The officers reentered the trailer and searched for evidence. After talking with Bobby, Jr., they located a .22 calibre pistol in a guitar case in the same bedroom where they had found Ann.

Ronald Tucker testified Tammy came over to ask for help at about 6:00 p. m. He testified among other things of the following remarks made to him by Tammy:

"The little girl come over and she said, please someone call for help, said, says, my Daddy has stuck the gun up to my Mom's head, I don't know whether she said Mother or not, I don't know what she said. Anyway she said he put the gun up to her head and shot her."

After the defendant had been taken to jail, and after Ann Stella had been placed in the ambulance to be taken to the hospital, Sheriff Brazelton and Agent Parrot questioned Tammy Tyler and Bobby Tyler, Jr., in the trailer. Bobby, Jr., told them he had, at his father's direction, taken the .22 calibre revolver and hidden it in a guitar case in the same bedroom where the body was found. Agent Parrot found the gun in the guitar case. Approximately an hour had elapsed since the initial entry. The guitar case had been placed between the bed and the wall and was not in plain view. None of the officers saw the guitar case during their initial entry.

After the gun was found in the guitar case, the officers arranged for Tammy and Bobby, Jr., to be taken to a relative's home. The officers remained on the scene for approximately another hour continuing their search of the trailer.

They found various .22 calibre slugs imbedded in the walls of the trailer. Ann Stella's purse was found on the living room floor. There were two (2) bullet holes in the purse, and two (2) .22 calibre slugs were found inside the purse. These items were introduced into evidence at trial, apparently to corroborate the testimony of Tammy Tyler.

The defendant contended in his motion to suppress that the search resulting in the seizure of the gun and the physical evidence in the trailer was invalid because there was no search warrant issued nor did the search fall within any of the exceptions to the warrant requirement. The trial judge upheld the search as valid because of the existence of exigent circumstances. He held that exigent circumstances existed because of the necessity of aiding the wounded woman and because there was a danger that the children could have tampered with or removed the gun and the other physical evidence while a search warrant was being obtained.

■ Warrantless searches are per se unreasonable under the Fourth Amendment unless the search falls within an exception to this rule, such as searches incident to arrest, consent searches, and searches justified by some exigency or emergency. *See Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Rippy v. State,* 550 S.W.2d 636 (Tenn.1977).

■ We agree that the initial intrusion of the officers into the trailer was justified by the necessity of ascertaining the location and the condition of the victim, of arresting the perpetrator, and of securing the safety of the officers and innocent bystanders by searching for possible accomplices.

"We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." Cf. *Michigan v. Tyler, supra,* 436 U.S. [499], at 510–11, 98 S.Ct. [1942], at 1950–1951 [56 L.Ed.2d 486]. "The need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent an exigency or emergency." *Wayne v. United States,* 115 U.S.App.D.C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.) And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Michigan v. Tyler, supra,* 436 U.S., at 510–11, 98 S.Ct., at 1950–1951; *Coolidge v. New Hampshire,* 403 U.S. [443], at 465–466, 91 S.Ct. [2022], at 2037–2038 [, 29 L.Ed.2d 564].

But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation," *Terry v. Ohio,* 392 U.S. [1], at 25–26, 88 S.Ct. [1868], at 1882 [, 20 L.Ed.2d 889] . . . (footnotes omitted) *Mincey v. Arizona, supra,* 98 S.Ct. at 2413–2414.

The initial entry was valid due to the emergency situation, and any evidence in

plain view of the officers during this entry was properly seized and was admissible.

However, once the body had been removed and the defendant had been taken into custody, there was no exigency or emergency to justify any further warrantless search. There was nothing to prevent the officers from posting a guard at the trailer until a warrant could be obtained. After the statements of the children had been taken, the children could have been removed to the same relative's home that they were taken to after the finding of the gun. No one else was present at the trailer who might have destroyed or altered any evidence.

■■■ We find there was no emergency or exigency to justify a further warrantless search once the victim had been located and tended to and the defendant had been arrested and taken to jail. Therefore the search resulting in the finding of the gun, the purse with bullet holes, and the various slugs, was unreasonable and the admission of this evidence was error. However, in view of the overwhelming proof of Defendant's guilt even in the absence of this evidence, we find its introduction to be harmless error. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Rippy v. State, supra.* We note the defendant was indicted and tried on a charge of first (1st) degree murder. He was convicted of second (2nd) degree murder. It is clear the jury was not inflamed or prejudiced by the introduction of the fruits of the unreasonable search.

■■ The defendant contends his statement to the police officers should be inadmissible because the illegally seized pistol was shown to the defendant during the questioning. There is nothing in the record to show that the defendant was induced into giving the statement or influenced to give the statement by seeing the pistol during the questioning. The defendant further claimed the statement was inadmissible because it was not a confession to first (1st) degree murder. The trial court treated it as a statement. We are of the opinion the statement was properly admitted by the trial court.

The defendant says a mistrial should have been granted when the following occurred on redirect examination of an officer by the District Attorney General:

"Q. The night you took the statement from Bobby Tyler, Junior, at the trailer, did he mention anything about firing any gun or grabbing any gun?

A. No, sir."

This evidence should not have been introduced.

Bobby Tyler, Jr., did not testify. The defendant's theory of this incident is that it was an accidental shooting which he says was a result of Bobby Tyler, Jr., and he struggling over the gun.

The trial judge, upon objection and motion for a mistrial by the defendant, removed the jury from the courtroom and heard argument on the motion. He then overruled the motion and returned the jury to the courtroom. Upon reseating the jury, the trial judge instructed the jury not to consider this answer and asked them to raise their hands if they would do so. Although the record does not directly show whether each of the jurors raised their hands, it inferentially shows they did by the words "all right" made by the trial judge at the time.

■ The prompt instruction of a trial judge to a jury directing them not to consider improper evidence generally cures any error. *Williams v. State*, 218 Tenn. 359, 403 S.W.2d 319 (1966); *Armstrong v. State*, 555 S.W.2d 870 (Tenn.Cr.App.1977), cert. denied 435 U.S. 904; unless such evidence is so far prejudicial that it was more probable that it affected the judgment than not. Rule 36(b), T.R.A.P.

■ In light of the record before us, we are of the opinion it is more probable this evidence did not affect their judgment than that it did.

■ The trial court properly permitted the testimony of a neighbor detailing what Tammy Tyler said when she asked him to call an ambulance. The child came to him within five to ten minutes after he had heard popping noises from the trailer. She

was excited and upset and she had witnessed the shooting of Ann Stella. This statement was admissible as an excited utterance [res gestae]. The circumstances surrounding the making of the statement satisfies the trustworthiness requirement which allows such statements to be admitted. *See Garrison v. State*, 163 Tenn. 108, 40 S.W.2d 1009 (1931); and *Williams v. State*, 542 S.W.2d 827 (Tenn.Cr.App.1976).

The complaint of the defendant alleging the State failed to arraign him can give him no relief.

The defendant first raised this issue in his motion for a new trial. This comes too late. This issue must be raised prior to entry of a plea and commencement of trial. The failure to do so results in a waiver of this procedural defect. Beyond this, the minutes of the court reflect the defendant was arraigned on the charge. The minutes of the court establish the verity of the matters therein, and the highest degree of evidence is required to upset them. *See Howard v. State*, 217 Tenn. 556, 399 S.W.2d 738 (1966). There was no evidence offered to impeach the minutes. In the absence of such evidence, the minutes are accepted as true. *Hill v. State*, 202 Tenn. 416, 304 S.W.2d 619 (1957).

O'BRIEN and SCOTT, JJ., concur.