IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 26, 2004 Session

## STATE OF TENNESSEE v. ROBBIE W. FIELDS

**Appeal from the Criminal Court for Bradley County**
**No. 00-267     Carroll L. Ross, Judge**

---

**No. E2004-00716-CCA-R3-CD - Filed January 7, 2005**

---

The defendant, Robbie W. Fields, was indicted by the Bradley County Grand Jury for possession of a Schedule I controlled substance, ecstasy, with intent to sell or deliver; possession of a Schedule VI controlled substance, marijuana, with intent to sell or deliver; possession of drug paraphernalia; tampering with evidence; and theft of property under $500. After a pretrial hearing, the trial court suppressed the evidence, and the charges were dismissed, which the State argues was error. Following our review, we reverse the trial court's determination that the officers unlawfully entered the defendant's apartment and remand for additional findings of fact and conclusions of law as to the seizure of evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and J. C. MCLIN, JJ., joined.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Shari Tayloe Young, Assistant District Attorney General, for the appellant, State of Tennessee.

Kenneth L. Miller, Cleveland, Tennessee, for the appellee, Robbie W. Fields.

**OPINION**

**FACTS**

We first will briefly outline the testimony before discussing it in detail. On March 8, 2000, the Cleveland Police Department ("CPD") received information from the Knoxville Police Department ("KPD") that a vehicle involved in a kidnapping several hours earlier in Knoxville was at an address, which they provided, in Cleveland. CPD officers went to the address where they found the described vehicle. They approached the duplex where the vehicle was parked, and one

officer peered through the blinds while the other knocked on the door. The defendant came into the hallway, asked who was at the door, and, when the police identified themselves, ran back in the direction from which he came. However, he soon returned, opened the door, and was immediately physically restrained. While officers searched for the kidnap victim, they discovered drugs at various places in the apartment. The defendant was arrested and indicted for possession with intent to sell or deliver ecstasy, possession with the intent to sell or deliver marijuana, possession of drug paraphernalia, tampering with evidence, and theft of property under $500, namely a government road sign found in the duplex.

At the pretrial hearing on the motion to suppress the evidence, Officer Dennis Maddux testified that, at approximately 7:00 a.m. on March 8, 2000, he had received a radio call from the dispatcher that "there was a car on Hamilton Circle Northwest that had been involved in a kidnaping in [Knoxville] a few hours earlier." Officer Maddux and other CPD officers went to Hamilton Circle, located the vehicle, and "confirmed through Knoxville that the registration was the same as that that was involved in the kidnaping." At this point, the kidnapping victim had not yet been located. Officer Maddux stated that "an hour or two, maybe three" had passed between the time of the kidnapping and the locating of the vehicle. After looking inside the car, the officers approached the defendant's apartment. Officer Maddux knocked on the door while Sergeant Tyson "peered through a blind that was in the front living room." Sergeant Tyson saw a "male subject" enter the hallway and heard him yell, "Who is it?" The police officers identified themselves as such, and, according to Maddux, the officers:

> back[ed] off the door for a moment, trying to figure do we have circumstances, exigent circumstances to kick the door to secure the safety of a victim that we've not located yet. And before we could do anything, the white male [the defendant] comes back into the living room and opens the door. And as he opens the door, we push our way on in, and we secure him on the floor and go through the apartment to try to find the victim of this kidnaping.

While checking the bathroom, the officers "immediately noticed a plastic bag swirling in the toilet, spinning around." After clearing the rest of the apartment, the officers retrieved the bag and the contraband from the toilet. Maddux said "other drugs" were found throughout the defendant's apartment. The male kidnapping victim was found later at another location. Another unknown male subject was found sleeping in the defendant's apartment.

On cross-examination, Officer Maddux said the vehicle was parked in the driveway nearest the defendant's side of the duplex. Maddux said KPD officers "were given information that it was not just one person that was involved" in the kidnapping, but that "several" were involved and "[t]here were descriptions given," although he could not recall them. Asked if he had any reason to believe that there was anyone else in the apartment at that time, Officer Maddux responded their "concern was just to find the victim. We didn't know what reason [the defendant] ran back into the back of the apartment for."

On redirect, Officer Maddux testified he found only the drugs floating in the toilet, but he did observe "other drugs" in the bedroom where the second male subject was sleeping. On recross, he stated the items in the plastic bag in the toilet were "[w]hite tablets," which he could not identify at the time he found them.

The defendant detailed his actions after he heard the knock on the door:

> I stepped out around the corner. I asked who it was. They said, they identified theirselves (sic) as police officers. I went back into the bathroom. I was already in the bathroom, beginning to break the marijuana up to throw in the commode. I threw it in there. I slammed the lid, hit flush, and went back out and opened the door.

Relying primarily on our analysis in State v. Rodney Ford, No. 01C01-9708-CR-00365, 1999 WL 5437 (Tenn. Crim. App. Jan. 7, 1999), the trial court suppressed the evidence seized from the defendant's apartment because, in the court's view, there were no exigent circumstances justifying the entry:

> THE COURT: Well, in looking at this case of State v. Ford - and the General's talked a great deal about what the officers didn't know, and set forth any number of hypothetical things that might have been happening. What the Court has to concern itself with is not what the officer didn't know but what the officers did know. And in making any determination, which clearly sets forth in the Ford case, "Warrantless searches and seizures" - and I'm reading directly from the case of State v. Ford - within a home are presumptively unreasonable." I think we can all agree that's a basic tenet of our Constitution, both the State and the Federal. "Absent exigent circumstances or consent" - we certainly didn't have consent here. I don't think there's been any argument there, so we're stuck with the exigent circumstances exception, " - police officers may not seek the subject of an arrest warrant here" - and it talks about - "in the home of a third person without first obtaining a search warrant." Then it says, "When exigent circumstances may be found" - and it sets forth three specific situations, may be found in three situations. "(1) When the officers are in hot pursuit of a fleeing subject", which they were not here; "(2) When the subject represents an immediate threat to the arresting officers or to the public." Certainly no threat to the arresting officers. I don't know of any threat to the public. There's an alleged citizen that may have been kidnaped, but I'll deal with that. The third one is, "When immediate police actions are necessary to prevent the destruction of vital evidence or thwart the escape of a known criminal." Well, that's not been shown either.

[THE STATE]: Your Honor?

THE COURT: Yes.

[THE STATE]: The victim of the kidnaping is evidence to that crime, and that is a vital piece of evidence to a kidnaping crime, is a victim.

THE COURT: Well, but there's no evidence that he was trying to destroy any evidence in this - that's what we have to look at. And it has to be more than just some hypothetical possibility. And the Court notes - and I'm not basing any of my decision on this, but this defendant's not even been charged with kidnaping in the county - and the question that, that I wrote down here is - and I'm not faulting - we get this more and more where officers from another jurisdiction calls one of our officers wanting us to go do, go look in somebody's home or go do this, or they put you on the spot and say, "We've got this and . . ." I think a good question, with the information that this officer very honestly says they gave him, could a, could a search warrant have issued on that information, and I'm not sure it could, with no more than they gave him. "We think this vehicle kidnaped somebody." You know, I don't know the basis of that. As I say, there's not even been a charge brought at this point, that I know of, and I'm not basing any of my decision on that, but I can't help but observe that. This is over a year ago, and you know, kidnaping's a pretty serious charge. Certainly the allegations are very serious. (Brief pause) And I don't think any Court could say if you don't have enough information for, to get a search warrant, you could take that same information and justify a warrantless search on some exigent circumstances theory. I just - of those three exceptions to the search warrant requirement, I can't see the State has shown any of those on this set of facts and circumstances. And I'm looking over and over, and I can't see that it fits within one of those from the facts and proof that's been shown here today.

And the officer, in all candor and all honesty, he admitted he had problems when he was there. They thought, "Well, do we have the right to go in?" And I understand their thinking, that there may be a victim in here. And sometimes you say, "Well, we'll go in and see if we can save a life, and we'll let the Court sort through the legal aspects of it." And I can understand that, and that's what we're doing now, sorting through the legal aspects of it. And I guess I would do the same thing if I thought a victim might be in there, but I've got the dirty work now, sorting through on the back end, officer. And again,

-4-

I'm not faulting you for what you did there, but in looking at these exceptions, I can't see it fits in one, and I don't think I've got any choice at this point but to sustain the motion to suppress.

. . . .

THE COURT: I think if they had a - and my point, you know, and I sort of hinted at this. I think if they had a right to go in, they had a right to look places, and if you see something swirling around the commode trying to get flushed down, you might reasonably assume that's drugs.

. . . .

THE COURT: For the record, and I want the order to reflect this, that I do not find that any of the exigent circumstances were shown as set forth in the case of State v. Ford, and I find that as a matter of fact[.]

## ANALYSIS

On appeal, the State contends that the police officers acted reasonably in relying on information from the Knoxville Police Department "that the victim might be in that apartment" and they possessed probable cause to "enter the house and ensure that their safety and the safety of those inside the house was no longer in danger." Additionally, the State argues exigent circumstances existed to justify the search as necessary "to prevent harm to the victim, if the victim was inside the apartment, a fact unknown at the time." The defendant responds that once he answered the door and was detained, the officers should have obtained consent or a search warrant and any "exigent circumstances of purported suspicious movement within" the residence were created by the officers knocking on the door.

### Standard of Review

We review the trial court's granting of the defendant's motion to suppress by the following well-established standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's

> findings of fact in a suppression hearing will be upheld unless the
> evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001).  The trial court's application of law to the facts, as a matter of law, is reviewed *de novo*, with no presumption of correctness.  State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

### Exigent Circumstances

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides the basis for our analysis:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

Additionally, Article 1, section 7 of the Tennessee Constitution provides

> [t]hat the people shall be secure in their persons, houses, papers and
> possessions, from unreasonable searches and seizures; and that
> general warrants, whereby an officer may be commanded to search
> suspected places without evidence of the fact committed, or to seize
> any person or persons not named, whose offences are not particularly
> described and supported by evidence, are dangerous to liberty and
> ought not to be granted.

The Tennessee Supreme Court has explained that "[t]he purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials,'" State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730 (1967)), and that "'[A]rticle I, section 7 is identical in intent and purpose with the Fourth Amendment,'" id. (quoting State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 221 Tenn. 6, 13, 423 S.W.2d 857, 860 (1968)).  Therefore, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement."  Id. (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)).  Accordingly, a trial court begins with the presumption that a warrantless search or seizure is unreasonable and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement was applicable at the time of the search or seizure.

One of the exceptions to the warrant requirement is the so-called "exigent circumstances" exception. As we stated in State v. McMahan, 650 S.W.2d 383 (Tenn. Crim. App. 1983), a search without a warrant is "per se unreasonable, unless it falls into one of the narrowly defined and carefully drawn exceptions . . . , i.e., . . . incident to a lawful arrest, those made by consent, in the 'hot pursuit' of a fleeing criminal, 'stop and frisk' searches, and those based on probable cause in the presence of exigent circumstances." Id. at 386 (quoting State v. Shaw, 603 S.W.2d 741, 742 (Tenn. Crim. App. 1980)).

The case relied upon by the trial court, Rodney Ford, 1999 WL 5437, defined "exigent circumstances" somewhat differently: "'(1) when the officers [are] in hot pursuit of a fleeing suspect; (2) when the suspect represent[s] an immediate threat to the arresting officers or the public; and (3) when immediate police action [is] necessary to prevent the destruction of vital evidence or thwart the escape of known criminals.'" Id. at *3 (quoting Jones v. Lewis, 874 F.2d 1125, 1130 (6th Cir. 1989)). These categories do not explicitly include the broadly recognized right of law enforcement officers to act in an emergency situation to protect life. Judge Warren E. Burger, later Chief Justice of the United States Supreme Court, explained in Wayne v. United States, 318 F.2d 205 (D.C. Cir. 1963), the need of officers sometimes to enter a premises without a warrant to take immediate life-saving action:

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. . . . A myriad of circumstances could fall within the terms 'exigent circumstances'. . ., e.g., smoke coming out a window or under a door, the sound of gunfire in the house, threats from the inside to shoot through the door at police, *reasonable grounds to believe an injured or seriously ill person is being held within.*

Id. at 212 (emphasis added).

This language was quoted with approval and applied in Howard v. State, 599 S.W.2d 280 (Tenn. Crim. App. 1980), where this court considered the legality of officers entering an apartment in Memphis, where they had been called by a sixteen-year-old female, ejected from the premises by her boyfriend, who then refused to respond to the officers' knock at the door. After telling them her boyfriend was keeping stolen merchandise inside the apartment, she entered it through a window. The officers then heard "loud noises . . . followed by silence." Id. at 281. To ascertain whether the woman had been injured, officers entered the apartment through the window, where they found her unharmed and the stolen goods. On appeal, this court, reciting the rationale of Wayne, explained that the seizure of the stolen property was lawful because "the record . . . suggests the existence of a legitimate emergency, requiring the officers' entry to assist the 16 year old girl." Id. at 282. Thus,

-7-

in addition to the "exigent circumstances" situations set out in <u>Ford</u>, law enforcement officers may also make a warrantless entry in an emergency to protect human life. <u>See also</u> <u>State v. Coulter</u>, 67 S.W.3d 3, 42 (Tenn. Crim. App. 2001) (recognizing the authority to make a warrantless entry and search of a house to render aid when circumstances would cause a reasonable and experienced law enforcement officer to believe that immediate assistance was required by someone within).

Various attempts have been made to articulate standards by which the objective reasonableness of a warrantless entry in an emergency situation may be judged. As explained in 3 Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 6.1(f) (3d ed. 1996), the "most ambitious" attempt to set such factors was undertaken in <u>Dorman v. United States</u>, 435 F.2d 385 (D.C. Cir. 1970), which concluded that the considerations in determining whether exigent circumstances existed were whether: (1) "a grave offense" was involved, particularly a crime of violence; (2) "the suspect [was] reasonably believed to be armed;" (3) there was a "clear showing of probable cause . . . to believe that the suspect committed the crime involved;" (4) there was "strong reason to believe that the suspect [was] in the premises being entered;" (5) there was a "likelihood that the suspect will escape if not swiftly apprehended;" and (6) "the circumstances that the entry, though not consented, [was] made peaceably."

Professor LaFave questions this approach as difficult for police officers to apply on the spot, saying it is "too sophisticated to be so applied, requiring as it does the making of on-the-spot decisions by a complicated weighing and balancing of a multitude of imprecise factors." LaFave, <u>supra</u> (footnotes omitted). He proposes a test based upon whether the arrest, on which the warrantless entry is based, was "planned":

> Although it is not readily apparent how a more workable but yet fair warrantless entry standard could best be expressed, it would seem that a solution is most likely to be found by distinguishing the truly "planned" arrest from the arrest which is made in the course of an ongoing investigation in the field. A "planned" arrest is one which is made after a criminal investigation has been fully completed at another location and the police make a deliberate decision to go to a certain place, either the arrestee's home or some other premises where he is believed to be in order to take him into custody.

<u>Id.</u>

LaFave explains why law enforcement officers must have the authority to enter a premises in an emergency:

> Not infrequently, a prompt entry to arrest is called for in order to minimize the risk that someone will be injured or killed. Sometimes the risk is to another person who is also in the premises to be entered, such as an undercover agent or informant, a possible hostage, or an

individual the person to be arrested knows has cooperated with the police. Delay may also increase the risk of harm to persons outside the premises. The passage of time may enhance the ability of those inside to make an effective forcible resistance when the police ultimately make their entry to arrest. And if the police are required to stake out the premises while a warrant is obtained, this may cause curious bystanders to gather in the immediate vicinity, where they might well be harmed in the event of forcible resistance to the police entry.

Id. (footnotes omitted). A number of cases supporting this reasoning are cited by LaFave, including the opinion of this court in Howard, as well as, for example, United States v. Laboy, 909 F.2d 581 (1st Cir. 1990) ("exigency of an infant kidnapping justifies the failure to get a warrant"); United States v. Bottoson, 644 F.2d 1174, 1176 (5th Cir. 1981) (victim of a kidnapping still missing at time of entry to arrest); People v. Cloud, 587 N.E.2d 270, 271 (N.Y. 1991) ( "potential innocent hostages" were in hotel room with defendant). The fact exigent circumstances often justify immediate action to try and aid a kidnap victim is explained in 89 John F. Decker, Journal of Criminal Law and Criminology 433, 470 (1999), as being "[d]ue to the inherently dangerous circumstances which surround a kidnapping, most courts take the position that when police officers receive a report of a kidnapping there is a per se need for immediate action which warrants use of the emergency doctrine."

In the present appeal, the reasonableness of the officers' warrantless entry into the defendant's residence must be viewed on the basis of their knowledge at the time. See People v. Thompson, 770 P.2d 1282, 1285 (Colo. 1989) ("The circumstances must be evaluated as they would have appeared to a prudent and trained police officer at the time the decision to conduct the warrantless search is made.") (citing People v. Malczewski, 744 P.2d 62, 66 (Colo. 1987)).

Officers were investigating a report of a very recent kidnapping; with the victim still missing, found the car used in the kidnapping parked in the driveway of the defendant's residence, where it was registered; and saw that, as the defendant peeked out and observed the uniformed officers, he retreated back into his residence and then quickly returned to the front door. Given that they were investigating a kidnapping of only a few hours earlier, and the defendant behaved suspiciously upon seeing them, substantial authorities support their decision to enter the defendant's residence and search for the kidnap victim. See United States v. Hughes, 993 F.2d 1313, 1315 (7th Cir. 1993) (holding that exigent circumstances existed where police were aware a woman and her child were in a known "drug house" where guns were often kept, that they might be in danger, and the police observed a woman and a boy run back into the house and yell "police" as officers approached); Oliver v. United States, 656 A.2d 1159, 1167 (D.C. 1995) (recognizing the "unique qualities" of kidnapping justifying immediate police action and that "a kidnap victim may be deemed inherently endangered"); State v. Stevens, 806 P.2d 92, 99 (Or. 1991) (holding that officers possessed probable cause that missing juvenile girls might be in danger, and that their investigation disclosed the "[d]anger to the lives of the children was an exigency in the circumstances of this case"); State v.

-9-

Weas, 992 P.2d 221, 225 (Kan. Ct. App. 1999) (Officers were not only justified in warrantless entry to preserve evidence of kidnapping, but serious violent crime of kidnapping justified entry due to the possibility of multiple suspects in residence and potential harm to police officers and other persons in the residence.); Spears v. State, 801 S.W.2d 571, 574 (Tex. Ct. App. 1990) (holding that officer was justified in warrantless entry and search when he testified "he felt time was of the essence in securing the safety of the abducted girl since [defendant's] vehicle was located in front of the searched residence, . . . [the defendant] was driving the car during the hours of the kidnapping, the [defendant] fit the general description of the suspect, and the girl, who could not be located on the scene of the alleged offense, was still missing"); People v. Diaz, 566 N.Y.S.2d 391, 392 (N.Y. App. Div. 1991) (holding that although kidnapping story was ultimately found to be a fabrication, officers were justified in warrantless search, and drugs seized in plain view were admissible, because officers were acting "upon a reasonable belief that they were confronted with an emergency situation where the safety of a child was potentially in jeopardy" and "[t]he intrusion was not primarily motivated by the intent to arrest and seize evidence and there was a reasonable basis, approximating probable cause, to associate the emergency with the area searched").

The defendant cites several cases on appeal in support of his argument that, rather than enter and search his apartment, officers should have detained him while they secured a search warrant. This argument ignores the fact that the crime being investigated was a kidnapping, occurring no more than three hours earlier, and officers were searching for the victim. Warrantless entries in theft or drug cases, relied upon by the defendant, do not have the same urgency as a search for a kidnapping victim. Likewise, we disagree with the defendant's assertion that the officers themselves created the exigent circumstances by identifying themselves as they knocked on the defendant's door. In fact, the defendant responded by going immediately to the interior of his apartment and then returning to open his door for the officers. Although the officers later learned that the defendant had gone to flush drugs down the toilet before opening his door, they had no way at the time of knowing that he had not just silenced the kidnap victim.

Based on the foregoing authorities and reasoning, we conclude that the trial court erred in finding, as a matter of law, that the officers were without authority to enter the defendant's apartment to search for the kidnap victim. However, we note that evidence was not presented at the hearing to clarify exactly where all the drugs were found and whether they were in plain view. There was conflicting testimony as to whether the toilet seat where the ecstasy and marijuana were found was up or down when the police entered the bathroom, and the trial court did not make a finding in this regard. Officers conducting a protective sweep are only allowed to search in places from which a suspect could launch an attack against the officers or, in an exigent circumstances situation, where any potential victims could reasonably be located. See State v. Wilson, 687 S.W.2d 720 (Tenn. Crim. App. 1984); State v. Tyler, 598 S.W.2d 798 (Tenn. Crim. App. 1980). Also, no evidence was presented at the suppression hearing as to where the drug paraphernalia or the stolen government property was found. Accordingly, we reverse the determination of the trial court that the officers unlawfully entered the defendant's apartment to search for the kidnap victim and remand for findings as to whether the drugs, paraphernalia, and stolen property were lawfully found.

## CONCLUSION

After a thorough review of the record, we reverse the trial court's order suppressing the evidence and remand for the trial court to determine whether the evidence seized was admissible.

_____
ALAN E. GLENN, JUDGE