IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 27, 2015 Session

**STATE OF TENNESSEE v. JOSEPH MEADOWS**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2012-CR-68       Robert E. Burch, Judge**

---

**No. M2015-00211-CCA-R3-CD – Filed January 11, 2016**

---

The Defendant, Joseph Meadows, was indicted for initiating the process of the manufacture of methamphetamine, possession of methamphetamine, and possession of drug paraphernalia.   The Defendant filed a pretrial motion to suppress the evidence seized during the warrantless search of his home.   The trial court denied the Defendant's motion, and the Defendant pleaded guilty to initiating the process of the manufacture of methamphetamine, in return for the dismissal of the remaining counts and an eight-year sentence to be served on supervised probation.   The Defendant reserved a certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2) as to whether the search of his home by law enforcement was lawful.   After review, we conclude that the search was lawful and thus, we affirm the trial court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Olin J. Baker, Charlotte, Tennessee, for the appellant, Joseph Meadows.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Wendell Ray Crouch, Jr., District Attorney General; and Margaret F. Sagi, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**

**I.  Facts**

This case arises from the search of the Defendant's residence, which resulted in the seizure of evidence related to the manufacture of methamphetamine. With regard to this seizure, a Dickson County grand jury indicted the Defendant with initiating the process of the manufacture of methamphetamine, possession of methamphetamine, and possession of drug paraphernalia. The Defendant filed a motion to suppress the evidence obtained during the search of his residence. He alleged that law enforcement entered his residence without a warrant and without probable cause using the pretext of having smelled an odor of methamphetamine.

## A. Motion to Suppress

The trial court held a hearing on the motion to suppress and the parties presented the following evidence: Agent Michael Pate, a 23rd Judicial District Drug Task Force agent, testified that he had been formally trained in the manufacture of methamphetamine, including a "live cook" training, which meant he had actually cooked methamphetamine in a controlled environment. He testified that new trends and methods for manufacturing methamphetamine presented quite often and that he attended yearly trainings on the changing trends and methods. He stated that in his three years as a task force agent, he had been inside approximately thirty methamphetamine labs; in his prior jobs, he had been inside approximately fifteen labs.

Agent Pate testified that he and his partner received citizen reports that the odor of methamphetamine was emanating from the Defendant's residence, which was located behind an establishment called "Picadilly Bar" in Dickson, Tennessee. Based on these reports, on December 8, 2011, after midnight, he and his partner drove into the parking lot outside Picadilly Bar in Dickson, Tennessee to check for the odor of methamphetamine. The agent recalled that it was very cold that day, and estimated the temperature to be at around twenty degrees Fahrenheit. Agent Pate pulled his vehicle onto the right side of the building and opened his vehicle door, and he immediately smelled the "very, very strong odor of meth being manufactured in the air . . . ." Agent Pate described the smell as a very strong odor of "Coleman fuel" and ether. He said the smell of a methamphetamine lab was very distinguishable, stating: "I've never come across anything else that smells like a meth lab other than a meth lab."

After he noticed the smell, Agent Pate called the dispatcher and told them that someone was manufacturing methamphetamine behind the Picadilly Bar. He told dispatcher that he needed assistance, and then he called Agent Ronnie Moore. Twenty minutes went by before another officer arrived. When asked why Agent Pate and his partner waited the twenty minutes before entering the Defendant's residence, Agent Pate replied that they waited because they knew the Defendant was a bondsman and a bounty

hunter and thus had weapons. He said that they did not know how many people would be inside the residence. Once assistance arrived, Agent Pate pulled his vehicle into the driveway in front of the Defendant's residence. He testified that he could smell the methamphetamine odor from inside his vehicle.

Agent Pate clarified the location of the Defendant's residence in relation to the Picadilly Bar. He stated that the bar was "up front" with a gravel parking lot that connected to the highway; to the right of the bar was a white house; to the right of the white house was a brick house with an upstairs apartment and a finished basement; behind the white house were trailers owned by the Defendant, which included his residence and an auto mechanic garage. Agent Pate stated that the distance from the bar to the Defendant's trailer was 120 to 150 feet and that his trailer was 50 to 75 feet behind the white house. The brick house was located 50 to 75 feet from the white house.

Agent Pate testified that he walked to the Defendant's residence behind the bar. He stated that there was not a "no trespassing" sign posted at the Defendant's driveway, but a sign that read "if you believe in life after death, cross this line," with a white supremacy sticker and an upside down peace sign sticker on it. Agent Pate approached the door of the Defendant's residence and announced himself as a drug task force agent. He further warned the occupants of safety concerns attendant to the manufacture of methamphetamine. Agent Pate explained to the jury that it was not safe because a methamphetamine lab can explode "at any time." He described an incident in the past where he had seen a man cooking methamphetamine in a parking lot and he had burst into flames without warning. Agent Pate stated he had witnessed these sudden explosions several times related to methamphetamine labs. Based on that experience, he believed that the Defendant's residence presented a dangerous situation.

Agent Pate testified that, as he approached the Defendant's house, the odor of methamphetamine became very strong. He was knocking on the door asking the occupants to come outside when he looked through the window into the kitchen and living room area. Through the window, he could see "several items to manufacture meth sitting on the kitchen table . . . ." Agent Pate also saw the Defendant and another man named Kevin Pickering inside before they came to the front door and opened it. When the door opened, the smell of methamphetamine "intensified." Agent Pate asked the Defendant if anyone else was inside the residence, and the Defendant responded negatively.

Agent Pate testified that officers checked the brick house and the white house for occupants while he and another officer cleared the Defendant's residence for occupants inside. Agent Pate stated, "It was very clear to me there was an active meth lab there

and if there is somebody else in there messing with it and still cooking meth or they're just in there hiding and this bottle exploded it's a dangerous situation, so we wanted to make sure that there was nobody else inside [the Defendant's] home." He testified that being on the scene was dangerous because no one was wearing protective gear and those present were breathing the toxic chemicals coming from the lab. Agent Pate stated that leaving a methamphetamine lab that is actively cooking unattended was very dangerous because of the risk of explosion.

Agent Pate stated that inside the Defendant's residence he found an "active one-pot meth lab" on the medicine cabinet in the bathroom. He stated that the "copper color" of the lab meant that the lab was "actively cooking," which presented "an immediate hazard." After sweeping the residence for occupants, Agent Pate donned protective gear and re-entered the residence to remove the methamphetamine lab. He stated that he was trained in the "removal of clandestine methamphetamine labs." Agent Pate stated that highway patrol and the fire department were notified to respond to the scene, as well as a hazmat team to decontaminate the scene.

Agent Pate testified that he did not seek a search warrant for the residence before entering because he knew it was an active methamphetamine lab based on the strong odor coming from the residence. He stated that he was concerned for the occupants' safety, as well as the officers present and anyone in the area, including those inside the nearby houses.

On cross-examination, Agent Pate testified that he donned the hazmat suit after entering the residence and finding the lab, and he denied waiting two hours to do so. Agent Pate stated that he pulled into the parking lot outside Picadilly Bar to see if he could smell methamphetamine because he had information that the Defendant was manufacturing methamphetamine. He stated that the Picadilly Bar did not have set business hours, but no cars were in the parking lot when he arrived. Agent Pate agreed that he did not check the bar for occupants, although it appeared that no one was inside. Agent Pate stated that, during the twenty minutes it took for backup officers to arrive at the scene, he did not attempt to contact anyone inside the white house or the brick house because there were not enough officers present to "handle the situation."

Agent Pate explained that the Defendant's residence was down a hill behind the Picadilly Bar and that the residence was not visible from the road at night. After he went behind the bar and down the hill into the "hole" where the Defendant's residence was, the smell of methamphetamine was much stronger, and this gave him cause to believe that methamphetamine was being manufactured inside the Defendant's residence, as opposed to the other residences close by. Agent Pate stated that it was "very clear"

4

that the smell was coming from the Defendant's residence and even more so once he was standing on the Defendant's front porch. He agreed that he did not call the fire department immediately after smelling the methamphetamine but contacted law enforcement to help clear the Defendant's residence and the other dwellings of any occupants.

Agent Pate testified that officers on the scene took the security cameras located on the Defendant's residence and turned the cameras into the evidence unit. He stated that the cameras were considered evidence because, typically when methamphetamine is being manufactured, people become paranoid and mount cameras on their residences to monitor their properties. He stated that the cameras were seized as "drug paraphernalia" in a lot of cases.

Agent Pate agreed that he had no background in chemistry but stated that he was familiar with cooking methamphetamine and its smell. He stated that the bottle found in the Defendant's residence with the methamphetamine inside was "capped" and not "venting" when he found it. He agreed that the Defendant was not read his *Miranda* rights. Agent Pate said he did not ask for consent to enter the Defendant's residence; once he found the lab, Agent Pate suited up and removed the lab. The agent recalled talking to the Defendant throughout, noting that the Defendant was cooperative and did not object to the search or their conversation. The Defendant "acknowledged" that he too could smell the lab from outside the residence.

Agent Pate stated that, when he knocked on the door of the Defendant's residence, his words were "come to the door." He agreed that he did not "ask" the occupants to exit the residence. He also agreed that the Defendant was detained at that point and was not free to leave.

On redirect-examination, Agent Pate was asked to describe the Defendant's residence and its location. He stated: "[The Defendant's residence is] an old single wide trailer. It's not in very good condition." He stated that it was sufficient to "[keep] the rain off" but was generally not a very secure house. Agent Pate agreed that he had been in approximately forty-five methamphetamine labs prior to that day. He stated that he had never been incorrect about the smell of a lab.

On recross-examination, Agent Pate stated that none of the labs he had been to personally had ever blown up.

Agent Chris Freeze testified that he worked for the 23rd Judicial District Drug Task Force and that he responded to the scene at the Defendant's residence. When he arrived

and exited his police vehicle, Agent Freeze noticed the "strong odor" of methamphetamine. He recognized the odor because he had been involved with various incidents involving methamphetamine labs.

Berry Westbrook testified as an expert in the field of air flow modeling and engineering. Mr. Westbrook testified that he had visited the scene of the Defendant's residence to determine the layout, topography, orientation of the dwellings, and the location points of the officers. He stated that he had listened to Agent Pate's narrative about the incident to determine the issue of whether it was possible or credible that Agent Pate smelled methamphetamine while outside the Defendant's residence. He reviewed the weather data from that day, the velocity and direction of the wind, and the temperature. Mr. Westbrook stated that the conditions were "relatively still but cold."

Mr. Westbrook testified that he went to the scene with some chemicals used to manufacture methamphetamine and placed the chemicals throughout the Defendant's residence. He allowed an hour to pass to allow for the chemicals to "coordinate" or co-mingle inside of the residence. He stated that the residence was not tight and that an odor would "permeate" into the environment. Using a "color metric tube," designed to change color in the presence of certain chemicals at certain concentrations, Mr. Westbrook measured the concentrations of the methamphetamine chemicals inside the residence. The device detected a concentration of seventy parts per million inside the residence; this concentration was well above the human smell threshold.

Mr. Westbrook then measured the concentration of the chemicals at several perimeter points surrounding the residence, including in the parking lot where Agent Pate initially parked. He stated that they measured from 150 feet from the edge of the Defendant's residence. Mr. Westbrook testified that he did not detect any chemical from ten feet away around the edge of the residence, much less 150 feet. Mr. Westbrook testified that, in his opinion, Agent Pate was not credible when he said that he could smell the methamphetamine odor from the parking lot. Mr. Westbrook stated that, from what he could tell, it was "impossible."

On cross-examination, Mr. Westbrook agreed that he was not present at the scene when the lab was discovered and that he could not recreate the actual chemical reactions that occurred that day. He agreed that he did not interview Agent Pate.

After the presentation of the evidence, the trial court denied the Defendant's motion to suppress, holding that the search and seizure of evidence in this case was conducted in accordance with the requirements of the Constitution. The trial court made the following findings:

1. Agents with the 23rd Judicial Drug Task Force and other law enforcement agencies had a right to be at a location near the [D]efendant's residence.

2. Two (2) law enforcement agents smelled the manufacture of methamphetamine at the [D]efendant's residence and premises.

3. The defense expert created a demonstration to determine whether law enforcement officers had the ability to smell the manufacture at a certain distance.

4. The demonstration by the defense expert had too many variables to be determined to mirror the conditions of the night of the offense.

5. The search of the [D]efendant's residence was based on probable cause that the manufacture of methamphetamine was occurring on the premises.

Thereafter, the Defendant pleaded guilty to initiating the process of the manufacture of methamphetamine in exchange for the dismissal of the remaining two counts and subject to a certified question of law regarding the legality of the search of his residence. The trial court entered the plea and sentenced the Defendant in accordance with the plea agreement to an eight-year probation sentence. Pursuant to Tennessee Rule of Criminal Procedure 37(b)(2), and in an approved order, the Defendant reserved the following certified question of law: "Whether the Court erred in denying to suppress the evidence obtained via a warrantless search and seizure of and from the Defendant's residence that was conducted in violation of the requirements and protections of the Tennessee Constitution, the Constitution of the United States, and applicable case law."

## II. Analysis

### A. Certified Question of Law

Because this appeal comes before us as a certified question of law, pursuant to Rule 37(b) of the Tennessee Rules of Criminal Procedure, we must first determine whether the question presented is dispositive. The question is dispositive "when the appellate court 'must either affirm the judgment [of conviction] or reverse and dismiss [the charges].'" *State v. Dailey*, 235 S.W.3d 131, 134 (Tenn. 2007) (alterations in original) (quoting *State v. Walton*, 41 S.W.3d 75, 96 (Tenn. 2001); *State v. Wilkes*, 684 S.W.2d 663, 667 (Tenn. Crim. App. 1984)). An issue is never dispositive when this Court may exercise the option to reverse and remand. *Wilkes*, 684 S.W.2d at 667. This

Court "'is not bound by the determination and agreement of the trial court, a defendant, and the State that a certified question of law is dispositive of the case.'" *Dailey*, 235 S.W.3d at 134-35 (quoting *State v. Thompson*, 131 S.W.3d 923, 925 (Tenn. Crim. App. 2003)). This Court must make an independent determination that the certified question is dispositive. *Id.* at 135 (citing *State v. Preston*, 759 S.W.2d 647, 651 (Tenn. 1988)). Rule 37(b)(2) of the Tennessee Rules of Criminal Procedure provides that a defendant may appeal from any judgment or conviction occurring as the result of a guilty plea. *State v. Long* 159 S.W.3d 885, 887 (Tenn. Crim. App. 2004). The following are prerequisites for an appellate court's consideration of the merits of a question of law certified pursuant to Rule 37(b)(2):

> (i) The judgment of conviction, or other document to which such judgment refers that is filed before the notice of appeal, contains a statement of the certified question of law reserved by the defendant for appellate review;

> (ii) The question of law is stated in the judgment or document so as to identify clearly the scope and limits of the legal issue reserved;

> (iii) The judgment or document reflects that the certified question was expressly reserved with the consent of the state and the trial judge; and

> (iv) The judgment or document reflects that the defendant, the state, and the trial judge are of the opinion that the certified question is dispositive of the case . . . .

Tenn. R. Crim. P. 37(b)(2)(A)(i)-(iv).

In *State v. Preston*, our Supreme Court stated its intention to "make explicit to the bench and bar exactly what the appellate courts will hereafter require as prerequisites to the consideration of the merits of a question of law certified pursuant to Tenn. R. Crim. P. 37(b)(2)(i) or (iv)." 759 S.W.2d 647, 650 (Tenn. 1988). First, the final order or judgment appealed from must contain a statement of the dispositive question of law reserved for review. *Id.* The question must clearly identify the scope and limits of the legal issue and must have been passed upon by the trial judge. *Id.* Second, the order must also state that: (1) the certified question was reserved as part of the plea agreement; (2) the State and the trial judge consented to the reservation; and (3) both the State and the trial judge agreed that the question is dispositive of the case. *Id.* Third, the defendant bears the burden of "reserving, articulating, and identifying the issue" reserved. *State v. Troy Lynn Woodlee*, No. M2008-01100-CCA-R3-CD, 2010 WL 27883, at *2 (Tenn. Crim. App., at Nashville, Jan. 6, 2010), *perm. app. denied* (Tenn. May 20, 2010) (citing *Preston*,

8

937 S.W.2d at 838). Failure to properly reserve a certified question of law pursuant to the requirements stated in *Preston* will result in the dismissal of the appeal. *Woodlee*, 2010 WL 27883, at *2 (citing *State v. Pendergrass*, 937 S.W.2d 848, 838 (Tenn. 1996)). The importance of complying with the *Preston* requirements has been reiterated by our Supreme Court in *State v. Armstrong*, 126 S.W.3d 908, 913 (Tenn. 2003), which stated that the *Preston* requirements are "explicit and unambiguous," in rejecting the defendant's argument in favor of substantial compliance with Tennessee Rules of Criminal Procedure 37.

In the case under submission, the Defendant's issue on appeal meets these requirements: he pleaded guilty; the judgment form referenced the attached certified question; and the addendum to the judgment form listed the question that the Defendant maintains on appeal. We agree that the question included in the addendum attached to the Defendant's judgment form is stated so as to identify clearly the scope and limits of the legal issue reserved and is dispositive of the case. Thus, we conclude that the issue is properly before this Court.

## B. Legality of Search and Seizure

The Defendant argues that the warrantless search of his residence and subsequent seizure of evidence was not conducted pursuant to a valid exception to the warrant requirement. He contends that the applicable exception to the circumstances of the search would have been the exigent circumstances exception; however, he further contends that Agent Pate's claim of smelling the odor of methamphetamine being manufactured was a "ruse" to forgo obtaining a search warrant. The State responds that Agent Pate's claim hinges on his credibility and that the trial court specifically accredited his testimony. The State further responds that Agent Pate, based on his experience and training in the field of methamphetamine manufacturing, had the "objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant. . . ."

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application

of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "'article 1, section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Sneed v. State*, 221 Tenn. 6, 423 S.W.2d 857, 860 (1968)). The analysis of any warrantless search must begin with the proposition that such searches are per se unreasonable under the Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few specifically established and well-delineated exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Tyler*, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). Evidence discovered as a result of a warrantless search or seizure is subject to suppression unless the State establishes that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

The exigent circumstances exception is at issue in this appeal. Exigent circumstances exist when "the needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). The State must show that such a search was "imperative" to justify not obtaining the requisite warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Hayes*, 188 S.W.3d 505, 514 (Tenn. 2006); *State v. Yeargan*, 958 S.W.2d 626, 641 (Tenn. 1997) (Reid, J., concurring). The following are frequently-arising situations that have been found to be sufficiently exigent to render a warrantless search of a domicile reasonable: (1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury. *Brigham City, Utah*, 547 U.S. at 403; *Minnesota v. Olson*, 495 U.S. 91, 100 (1990); *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006); *State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005).

Our Supreme Court in *State v. Meeks* specifically addressed the exigent

circumstances exception in the context of a methamphetamine lab inside a dwelling, a hotel room in that particular case. 262 S.W.3d 710 (Tenn. 2008). Addressing exigent circumstances generally, the Court first stated:

> Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant. Thus, in assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant. The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry. Mere speculation is inadequate; rather, the State must rely upon specific and articulable facts and the reasonable inferences drawn from them. The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant. The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone. Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm.

*Meeks*, 262 S.W.3d at 723-24 (footnotes omitted). Addressing the circumstances of methamphetamine labs specifically, the Court stated:

> Methamphetamine laboratories are regarded as highly dangerous. In 2000, the United States House of Representatives explained:
>
>> The methamphetamine epidemic in America differs in kind from the threat of other illegal drugs because methamphetamine can be made from readily available and legal chemicals and substances, and because it poses serious dangers to both human life and the environment. Additionally, these chemicals and substances are utilized in a manufacturing process that is unstable, volatile, and highly combustible. Even small amounts of these chemicals, when mixed improperly, can cause explosions and fires. For every one pound of methamphetamine that is produced, approximately five pounds of toxic and often lethal waste

11

products may be left behind at the laboratory site, or disposed of in rivers, kitchen sinks, or sewage systems in an effort to conceal evidence of illegal manufacturing. More disturbing is that most of these laboratories are situated in residences, motels, trailers, and vans, and often times are operated in the presence of children.

In addition to being highly combustible, the vapors or fumes that are generated in the production of methamphetamine pose further dangers. For example, exposure to the toxic fumes or vapors produced during the manufacture of methamphetamine, some of which are carcinogenic, can cause serious inhalation injuries to those at the laboratory site and sometimes even to neighbors.

The hazards posed by an actively operating methamphetamine laboratory are so significant that a number of state and federal courts have determined that the discovery of an actively operating methamphetamine laboratory, in and of itself, creates an exigent circumstance justifying immediate action without the attendant delays that accompany obtaining a search warrant. Other courts that have recognized the dangers of actively operating methamphetamine laboratories have stopped short of adopting a per se rule. Rather, they have based their finding of exigency on the location of the particular laboratory. These courts have focused on whether there were people in the vicinity of the actively operating methamphetamine laboratory, notably neighbors, law enforcement officials, and those manufacturing the methamphetamine. Regardless of the approach taken, whether a per se rule or a determination based upon the presence of others in the vicinity, the scope of a permissible warrantless search remains limited to the scope of the exigency.

*Id.* at 724 (citations omitted). In *Meeks*, the officer testified that the odor of methamphetamine emanating from the hotel room was "instantly recognizable and unmistakable" and that, when standing outside the door of the hotel room, the officer "could smell what [he] knew to be a meth lab." *Id.* at 714. Out of concern for the safety of hotel occupants close by, the officers in *Meeks*, without contacting the hazardous materials team or obtaining a search warrant for the hotel room, broke down the door of the hotel room and discovered an active methamphetamine lab. *Id.* at 714-15. Based on these circumstances, our Supreme Court held that the facts clearly established that exigent circumstances existed to justify the warrantless search of the hotel room. *Id.* at 724. The Court held that the distinctly strong odor of methamphetamine emanating from the

12

hotel room indicated to the officers that an active methamphetamine lab was contained inside, putting the occupants and those in the immediate vicinity in serious danger. *Id.* at 726-27. The Court held that the conclusion that an active methamphetamine lab was inside the hotel room " provided the officers with an objectively reasonable basis for concluding that there was an immediate need to act to protect themselves and others from serious harm." *Id.* at 727. As such, the warrantless search of the hotel room was justified under the exigent circumstances exception to the Fourth Amendment. *Id.*

In the present case, Agent Pate testified that he exited his vehicle in the parking lot outside the Picadilly Bar and immediately smelled the "very, very strong odor of meth being manufactured in the air . . . ." Agent Pate said that he knew that the odor was methamphetamine based on its "distinguishable" odor which he described as unlike any other odor. Agent Pate testified that the distinguishable odor was certainly recognizable based on its uniqueness. As he approached the Defendant's residence, located behind the Picadilly Bar, the odor became much stronger and it was "very clear" to Agent Pate that the methamphetamine odor was coming from the Defendant's residence. Agent Pate also testified that the Defendant's residence was located approximately 150 feet from the Picadilly Bar and several other residences, and this close proximity of the other residences concerned him due to the risk of explosion of the lab. Agent Pate testified that he knew an active methamphetamine lab could explode, thus posing a risk to the occupants of the Defendant's residence as well as those in close proximity.

We conclude that the evidence does not preponderate against the trial court's finding that Agent Pate smelled the odor of methamphetamine emanating from the Defendant's residence. Agent Pate had significant experience in the area of hazardous materials, particularly methamphetamine, and he testified that the hazardous nature of the chemicals used had caused labs to explode in the past. The number of residences close to the Defendant's residence gave Agent Pate additional cause to quickly dismantle the methamphetamine lab. The trial court specifically concluded that Mr. Westbrook's testimony about his re-creation of the scene contained too many unknown variables, and thus, was not an accurate demonstration of the circumstances on the day of the search. We will not second guess the trial court's credibility finding as it concerns Agent Pate or Mr. Westbrook. We hold that the trial court did not err when it concluded that Agent Pate had probable cause to enter the residence without a search warrant pursuant to the exigent circumstances exception.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE